**George Lee HUGHES,
Petitioner–Appellant,**

v.

**R.G. BORG, Respondent–Appellee.**

**No. 88–15517.**

United States Court of Appeals,
Ninth Circuit.

Submitted April 11, 1989.*

Decided March 5, 1990.

---

1. Arizona may, of course, submit proposals to the EPA for its consideration in developing the plans.

* The panel finds this case appropriate for submission without oral argument pursuant to Ninth Circuit Rule 34–4 and Fed.R.App.P. 34(a).

George L. Hughes, Pro se, Represa, Cal., for petitioner-appellant.

Sharon G. Birenbaum, Deputy Atty. Gen., San Francisco, Cal., for respondent-appellee.

Before CHOY, WALLACE and WIGGINS, Circuit Judges.

WIGGINS, Circuit Judge:

George Hughes, a California state prisoner, appeals pro se the district court's denial of his petition for a writ of habeas corpus, 699 F.Supp. 779. Hughes alleges three grounds for habeas relief: (1) prejudicial error at trial due to jury and prosecutorial misconduct, because a search warrant affidavit and a police report, which had not been admitted into evidence, were sent into the jury room during deliberations; (2) denial of his sixth amendment right to counsel due to ineffective assistance by Hughes' appellate counsel; and (3) denial of due process as a result of the trial court's failure to instruct the jury that it must find intent to kill before convicting the defendant of special circumstances felony murder. We have jurisdiction under 28 U.S.C. § 1291 (1982), and we affirm.

## BACKGROUND

In 1982, George Hughes was tried in California Superior Court for first degree murder with special circumstances, kidnapping, robbery, and illegal possession of a firearm. The facts presented at trial were as follows: At 3:00 a.m. on November 8, 1980, after closing and cleaning up Church's Fried Chicken restaurant in El Cerrito, California, Mary Washington, Sammy Lewis, Duane Mackie, and another co-worker left the restaurant through the front door. Washington, the assistant manager, locked the front door. Washington was wearing brown slacks and a brown jacket pinned with a Church's Fried Chicken badge and her name tag. Sammy Lewis testified that as Washington walked to her car, a burgundy Oldsmobile, she was approached by a man she seemed to know. The man asked her for help. Washington told him she could not help him and got into her car. The man talked to Washing-

ton briefly through her car window, and then Lewis saw Washington slide over to the passenger side of her car. The man got into the driver's seat and drove away.

Washington failed to open the restaurant the next morning. At 10:00 a.m., an employee called the area manager to report that the restaurant had not been opened. The area manager and the police arrived at the restaurant and Lewis gave a description of the man he had seen leave with Washington at 3:00 a.m. Lewis indicated that the man looked like a former employee of Church's Fried Chicken. The area manager checked the store and found $2,506 missing.

The following evening, November 9, 1980, the restaurant's management called a meeting of the employees. Lewis testified at trial that when he drove up to the restaurant for the meeting, Hughes ran up to Lewis' car and said "Say man, did you see me that night? Was it me that you saw? Couldn't have been me because I have an alibi. I was in Los Angeles that night." At the meeting, Detective Michael Capuono asked Lewis if Hughes, who was present at the meeting, was the man Lewis had seen with Washington. Lewis indicated that Hughes was not the man he saw.[1]

On November 17, 1980, an investigator discovered a body at the bottom of a highway embankment. The deceased wore brown slacks and a brown jacket with a name tag which read "Washington, Assistant Manager." The body was taken to the coroner's office where Dr. Paul Hurman performed an autopsy. Dr. Hurman testified that the cause of death was a bullet wound in the head. The deceased was identified as Mary Washington through comparison with dental charts.

Tommi Banducchi testified that, during the month of November 1980, she looked out the window of her home at 1920 Junction Street in El Cerrito and saw a man

---

1. On November 19, 1980, Lewis told the police that he did not see the face of the man who approached Washington. On February 13, 1981, and at the preliminary hearing, Lewis again claimed that Hughes was not the same man. At trial, however, Lewis testified that Hughes was the man he had seen with Washington on the morning she disappeared. On cross-examination, Lewis admitted that his identification of Hughes did not become positive until the week before trial.

park a burgundy car. The man sat in the car while he wiped a few things off inside the car. He then went to the trunk, took something out, and walked away. Ms. Banducchi identified Hughes as the man she saw park the car.

On November 29, 1980, Officer Gary Priche found the burgundy car, which matched the description of Washington's car, on the 1900 block of Junction Street. The car looked dirty as if it had been left for a few days. Priche noticed blood on the outside of the car which had dripped out through the kick plate. Priche found blood on the passenger seat and on the kick plate inside the car. The blood type matched that of Washington. Priche also discovered a spent bullet on the floorboard.

On February 10, 1981, a man robbed J.J. Mills Pizza in El Cerrito. The two employees present during the robbery identified Hughes as the man who robbed them through a photograph array. Hughes' fingerprints were found on a menu which the robber touched prior to the robbery. At trial, both employees identified Hughes as the robber.

On February 11, 1981, during the investigation of the J.J. Mills Pizza robbery, police officers served a search warrant on Hughes' residence. During the search, the officers discovered evidence which they believed tied Hughes to Washington's murder. That same day, the officers served a second warrant on Hughes' residence to search for evidence of the Washington murder.

During that search, the officers seized the following items: a purse that was stolen from an employee during the J.J. Mills Pizza robbery; a loaded handgun registered to Washington; a mask; a totebag;[2] nineteen .32 caliber Gaco cartridges; a 1980 diary which contained notations about robberies Hughes had committed; and a 1980 Church's Fried Chicken sales log containing a management school certificate reported stolen from the manager's car on November 1, 1980. Both Hughes and his girlfriend were arrested as suspects for the J.J. Mills Pizza robbery and Washington's murder.

The next day, on the basis of two entries in Hughes' diary,[3] the officers executed a search warrant of Hughes' father's residence. The officers found and seized a .32 caliber automatic pistol. A ballistics expert testified that the bullet found in Washington's car was shot from this pistol.

A police officer employed at the jail where both Hughes and his girlfriend were housed testified that, on the same day Hughes' father's gun was seized, Hughes' girlfriend yelled over to Hughes' cell that a search warrant had been served on his father's residence. Hughes immediately called for the jailer and requested to make a phone call. During his call, Hughes asked what the police had taken. After a pause, he responded "Well, they got the right gun." He then stated that he probably would be going away for twenty years or longer.

Hughes' brother-in-law, Charles Cox, testified that Hughes told Cox that he had "pulled a job" at Church's Fried Chicken. Hughes told Cox that he went to the restaurant, approached a woman in a car, showed her his gun, and instructed her to move over to the passenger side of the car. He then got into the car and drove down the MacArthur Freeway. The woman pleaded with him saying, "You can have anything you want, just don't kill me." Ignoring her pleas, Hughes shot her in the head, dumped her body, and parked the car near a BART station. The 1900 block of Junction Street is located near a BART station.

On October 3, 1980, two Fox Photos and one Foto–Mat were robbed in the San Pablo/El Cerrito area. All three employ-

---

2. At trial, a friend of Washington's testified that the totebag belonged to Washington. One of Hughes' robbery victims, however, identified the bag as his, testifying that it was taken during the robbery.

3. A diary entry from a few days before the murder stated that Hughes had borrowed his father's "piece," and another entry from a few days after the murder stated that Hughes had returned the "piece." Hughes' father owned two guns.

ees involved gave police descriptions of the robber's car and license plate number which matched Hughes' girlfriend's car. At trial, two of the three employees identified Hughes as the robber. On October 30, 1980, a similar pair of robberies of a Foto–Mat and a Fox Photo occurred. During the Foto–Mat robbery, the robber tore the phone off the wall. Hughes' fingerprints were found on the phone. The employee present during that robbery indicated at trial that Hughes could have been the robber.

On January 17, 1981, a man robbed Round Table Pizza in Richmond, California. At trial, the employees identified the stocking mask and gun found in Hughes' apartment as instruments used in the robbery. One employee thought Hughes, a former Round Table employee, was the robber.

In May of 1982, Hughes was convicted in the California Superior Court of first degree murder with three special circumstances, murder committed for financial gain, murder committed during the course of robbery, and murder committed during the course of kidnapping, in violation of California Penal Code §§ 187 and 190.2. Hughes was also convicted of the felonies underlying the murder—robbery, kidnapping to commit robbery, and kidnapping. In addition, Hughes conceded guilt for seven counts of robbery, one count of attempted robbery, and six counts of illegal possession of a firearm. Hughes was sentenced to nine years on these charges and life imprisonment without possibility of parole on the murder conviction.

On June 15, 1982, Hughes filed a motion for a new trial, alleging that a police report which had not been admitted into evidence was present in the jury room during deliberations. In fact, two extraneous documents were present in the jury room. Prior to trial, the prosecutor had premarked all of his exhibits, including four search warrants with affidavits. The search warrants were admitted into evi-

dence. However, the clerk inadvertently received into evidence the affidavits and the police report accompanying the search warrants. At the jury's request, the clerk sent the exhibits, which erroneously contained the extraneous documents, into the jury room.

The California Superior Court denied Hughes' motion for new trial. The trial judge determined that the information in the police report was duplicative of evidence produced at trial and, therefore, the presence of the police report in the jury room did not prejudice the verdict. Hughes then appealed.

The California Court of Appeal struck the "committed for financial gain" special circumstance but in all other respects affirmed Hughes' conviction. The California Supreme Court denied Hughes' petition for review. Both the California Court of Appeal and the California Supreme Court denied petitions for habeas corpus. Hughes then filed a petition for a writ of habeas corpus in federal district court. The district court dismissed the habeas petition finding that the extraneous material did not prejudice the verdict because the material was duplicative of properly admitted evidence, and because the other evidence overwhelmingly established Hughes' guilt. Hughes timely appealed.

## STANDARD OF REVIEW

This court reviews the district court's denial of a habeas corpus petition de novo. *Dickson v. Sullivan,* 849 F.2d 403, 405 (9th Cir.1988).

## DISCUSSION

### I. *Jury Misconduct*[4]

Hughes argues for reversal of his conviction because two documents, a police report and a police officer's affidavit, were improperly allowed into the jury room during deliberations. The district court determined that there was no reasonable possi-

---

**4.** Hughes also raises a claim of prosecutorial misconduct with regard to the presence of extraneous material in the jury room. This claim lacks merit. Hughes has presented no evidence that the placement of these items in the jury room resulted from anything other than the clerk's inadvertence.

bility that these extraneous documents could have affected the verdict because they were merely duplicative of evidence properly admitted at trial. The court also determined that the other evidence of Hughes' guilt was so overwhelming that there was no reasonable possibility that the jury would have found Hughes not guilty in the absence of the extraneous information. We agree.

■ State defendants have a federal constitutional right to an impartial jury and jurors have a correlative duty to consider only the evidence that is presented in open court. *Bayramoglu v. Estelle*, 806 F.2d 880, 887 (9th Cir.1986). When the jury breaches this duty by considering extraneous facts not introduced in evidence, "a defendant has effectively lost the rights of confrontation, cross-examination, and the assistance of counsel with regard to jury consideration of the extraneous evidence." *Gibson v. Clanon*, 633 F.2d 851, 854 (9th Cir.1980), *cert. denied*, 450 U.S. 1035, 101 S.Ct. 1749, 68 L.Ed.2d 231 (1981). Thus, when it appears that the jury has obtained or used extraneous material, the defendant is entitled to a new trial if there is "a reasonable possibility that the [extraneous] material *could* have affected the verdict." *Marino v. Vasquez*, 812 F.2d 499, 504 (9th Cir.1987) (quoting *United States v. Vasquez*, 597 F.2d 192, 193 (9th Cir.1979).

Because the jury obtained the extraneous material and because there is a reasonable possibility that it could have affected the verdict, Hughes is entitled to a new trial unless the government can prove that any constitutional error was harmless beyond a reasonable doubt. *Dickson*, 849 F.2d at 405. In this case, the government may do so by making one of two showings.

The government could show that the extraneous material was merely duplicative of evidence properly introduced in open court. A number of federal courts have recognized that extraneous material which is duplicative or cumulative may render a jury misconduct error harmless. *See United States v. Bagley*, 641 F.2d 1235, 1241 (9th Cir.) (mistrial properly denied where extraneous material was merely cumulative

of evidence already admitted), *cert. denied*, 454 U.S. 942, 102 S.Ct. 480, 70 L.Ed.2d 251 (1981); *United States v. Guida*, 792 F.2d 1087, 1094 (11th Cir.1987) (no reasonable possibility of prejudice where extraneous material was cumulative of evidence already before the jury); *United States v. Treadwell*, 760 F.2d 327, 339 (D.C.Cir.1985) (transmittal of extraneous document to jury is harmless error where document was cumulative of other properly admitted evidence), *cert. denied*, 474 U.S. 1064, 106 S.Ct. 814, 88 L.Ed.2d 788 (1986).

The other way the government could demonstrate harmless error is by showing that the other evidence amassed at trial was so overwhelming that the jury would have reached the same result even if it had not considered the extraneous material. *See United States v. Bagnariol*, 665 F.2d 877, 887 (9th Cir.1981) (suggesting that overwhelming evidence may be sufficient to uphold a conviction even in the presence of extraneous material), *cert. denied*, 456 U.S. 962, 102 S.Ct. 2040, 72 L.Ed.2d 487 (1982); *United States v. Tebha*, 770 F.2d 1454, 1456 (9th Cir.1985) (where other evidence against defendant "was far from overwhelming," court was constrained to reverse because of extraneous material); *cf. United States v. McKinney*, 434 F.2d 831, 832–33 (5th Cir.1970) (affirming defendant's conviction, despite presence of extraneous influence on jurors from newspaper stories, based in part on "overwhelming evidence of [defendant's] guilt and absolutely no evidence of his innocence"), *cert. denied*, 401 U.S. 922, 91 S.Ct. 910, 27 L.Ed.2d 825 (1971).

### A. *The Police Report*

■ One of the extraneous documents before the jury was a police report regarding a phone call by an anonymous informant. The informant stated that one of Hughes' relatives told the informant that Hughes had confessed to the kidnapping and murder of Washington. The California trial judge and the district court found that the information in the police report was duplicative of the trial testimony of Charles Cox, Hughes' brother-in-law.

We agree that the police report was duplicative of Cox's testimony. Hughes concedes as much in his brief by stating that Cox's testimony is "almost word for word verbatim" of the information contained in the police report. The police report's recitation of the anonymous phone call parrots Cox's testimony concerning the details of Hughes' description of his kidnapping and murder of Washington. Because Cox's testimony was tested by cross examination in open court, we find that the presence of the police report in the jury room did not prejudice the verdict.

### B. *The Search Warrant Affidavit*

The second extraneous document before the jury was a police officer's affidavit attached to the search warrant for the second search of Hughes' residence. The district court found the affidavit wholly duplicative of evidence at trial. We disagree. Although much of the affidavit was duplicative of evidence introduced at trial, it also contained some extraneous information. This information could have prejudiced Hughes' defense.

The affidavit contained statements from Duane Mackie, who worked with Washington the night she was killed. Mackie's description of the man who approached Washington was more specific than the description given by Lewis at trial. Mackie stated that the man wore a dark, ¾ length coat with a fur collar. Yet, Mackie did not testify at trial and thus his description of Hughes was not tested by cross examination in open court.

Later in the affidavit, the police officer stated that during the first search of Hughes' residence, he observed three darkly colored ¾ length coats with fur collars. The officer stated that one of the coats had a stain which appeared to be dried blood on a right side pocket. The officer also stated his belief that the stain could have been Hughes' blood, shed as a result of struggling with Washington. This information was not tested in open court because the prosecution did not introduce the coat as evidence, nor did it verify that the stain on the coat was blood.

Because this evidence was not duplicative of any evidence properly admitted at trial, we must consider whether the other evidence adduced at trial was "so overwhelming that 'we can say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error.'" *United States v. Henry*, 528 F.2d 661, 668 (D.C.Cir.1976) (quoting *Gaither v. United States*, 413 F.2d 1061, 1079 (D.C.Cir.1969). Based on our independent review of the entire record, we are convinced beyond a reasonable doubt that the jury would have found Hughes guilty without considering the search warrant affidavit.

The manager of Church's Fried Chicken testified that on November 1, 1980, someone stole from his car a briefcase which contained his manager's certificate from Church's Fried Chicken Management School. The manager also testified that Hughes visited the restaurant on November 2, 1980 after closing time, but left after the manager refused to let him inside the restaurant. During the second search of Hughes' residence, the police found the manager's certificate as well as a Church's sales log. The police also found Hughes' diary in which Hughes had written during the week of November 1, 1980 that he had been "unsuccessful at Church's." These facts all establish Hughes' intent to commit a robbery at the restaurant.

Hughes' diary contained an entry a few days prior to the murder which stated that he had borrowed his father's "piece." An entry several days after the murder stated that Hughes had returned the "piece." An officer at the jail testified that he overheard Hughes immediately call his father after learning that a search warrant had been served on his father's residence. The officer testified that Hughes asked the party on the other end of the phone line what the police had taken, and after a pause Hughes said "Well, they got the right gun." Then Hughes stated that he probably would be going away for twenty years or longer. A ballistics expert testified at trial that the spent bullet found in Wash-

ington's abandoned car was shot from the gun the police seized at Hughes' father's residence. Similar unused bullets were discovered in Hughes' residence. These facts strongly implicate Hughes as Washington's murderer.

Furthermore, Lewis testified that just before the meeting called by Church's management after Washington disappeared, Hughes ran up to Lewis and said that Lewis could not have seen Hughes with Washington the night of the murder because Hughes had an alibi. Banducchi testified that she saw Hughes park Washington's car on the street, wipe down the interior, and walk away. Cox testified that Hughes told him that Hughes had gone to Church's Fried Chicken the night of the murder, had shown Washington his gun, forced her to let him drive her car down the freeway, listened to her beg for her life, then shot her in the head and dumped her body, and abandoned the car near a BART station. Cox's testimony was consistent with Lewis' description of how Hughes approached Washington's car, and the discovery of Washington's car near a BART station. Additionally, the police discovered in Hughes' residence Washington's gun and totebag, which was covered with blood of the same type as Washington's. These facts remove any reasonable doubt from our minds concerning Hughes' guilt for the murder, with special circumstances, of Mary Washington.

Furthermore, Hughes offered no significant exculpatory evidence at trial. Hughes called only three witnesses on his behalf. Two of those witnesses testified on collateral matters so far removed from any material issues at trial that we cannot justify serious consideration of them. Hughes' third witness, Vincent Smith, testified that the totebag identified at trial as Washington's, was his totebag stolen in the robbery of the J.J. Mills Pizza Parlor. The probative value of Smith's testimony, in the face of the overwhelming evidence against Hughes, does not raise a reasonable doubt in our minds concerning Hughes' guilt. Therefore, we hold that even though a constitutional violation did occur as a result of the jury's misconduct in this case, the other

evidence of Hughes' guilt at trial is so overwhelming that it renders the constitutional error harmless.

## II. *Ineffective Assistance of Appellate Counsel*

Hughes raises three claims that his appellate counsel, Erik Henrikson was ineffective. Hughes contends that Henrikson was ineffective in: (1) failing to raise a claim of ineffectiveness with respect to Hughes' trial counsel; (2) in failing to resolve inaccuracies in the record before the California Court of Appeal; and (3) inadequately preparing a petition for review by the California Supreme Court.

■ To establish a prima facie claim of ineffective assistance of counsel, the defendant must show that counsel's performance was deficient and that the deficient performance prejudiced the defense. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). Deficient performance is performance which is objectively unreasonable under prevailing professional norms. *Id.* at 688, 104 S.Ct. at 2064. Prejudice results when there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. at 2068. We strongly presume that counsel's conduct was within the wide range of reasonable assistance, and that he exercised acceptable professional judgment in all significant decisions made. *Id.* at 689, 104 S.Ct. at 2065; *Weygandt v. Ducharme,* 774 F.2d 1491, 1493 (9th Cir.1985).

### A. *Failure to Raise Claim of Trial Counsel's Ineffective Assistance*

Hughes argues that Henrikson provided ineffective assistance on appeal when he refused to raise a claim that Hughes' trial counsel was ineffective in: (1) advising Hughes to plead guilty to the charges unrelated to Washington's murder; (2) failing to obtain sworn statements from the jurors to prove that they considered the extraneous material that was present in the jury room; (3) allegedly allowing the prejudicial

evidence to go before the jury; and (4) allegedly conceding the murder during closing argument. Because we find below that Hughes' trial counsel was not ineffective, we conclude that Henrikson's decision not to raise the issue on appeal does not constitute ineffective assistance.

### 1. Advice to Plead Guilty to Robbery Charges

■ Hughes contends that prior to his guilty plea, all but two of the robbery victims were either unsure or could not identify Hughes as the robber. Subsequent to his plea, all victims positively identified Hughes as the robber. From these facts, Hughes concludes that trial counsel's advice to plead guilty constituted ineffective assistance of counsel. Hughes' claim lacks merit.

There was substantial other evidence of Hughes' guilt on the robbery charges in addition to the witness identifications. Hughes' fingerprints were found in the J.J. Mills Pizza restaurant. The car used for the Foto–Mat/Fox Photo robberies on October 3 was similar in description and license plate number to Hughes' girlfriend's car. Hughes' fingerprints were found on the phone the robber touched in the October 30 Foto–Mat robbery. In light of this incriminating evidence, plus the possibility that the employees would identify Hughes as the robber, Hughes' trial counsel made a tactical decision that Hughes should plead guilty. That decision was not objectively unreasonable.

### 2. Failure to Obtain Sworn Statements from Jurors

■ Hughes contends that trial counsel did not properly preserve the juror misconduct issue because trial counsel did not obtain sworn affidavits from the jurors to prove misconduct occurred. However, this proof was unnecessary because no one disputes that the extraneous material went before the jury. Furthermore, we have already concluded that the evidence preserved by trial counsel was sufficient to establish a constitutional violation on the basis of jury misconduct. We have also concluded, however, that the other overwhelming evidence against Hughes renders the constitutional violation harmless. Although sworn affidavits might have been helpful in the first instance, such affidavits were not necessary to establish the constitutional violation and would not have aided in securing a reversal of Hughes' conviction because of the overwhelming nature of the nonextraneous evidence against Hughes. Thus, trial counsel's failure to secure sworn affidavits did not prejudice Hughes.

### 3. Allegation that Trial Counsel Allowed Prejudicial Evidence to Go Before Jury

■ Hughes contends that his trial counsel erroneously allowed the extraneous material to go before the jury. This claim lacks merit because the jury's receipt of that material was attributable to an error by the clerk, not by trial counsel. By objecting each time the prosecution tried to admit the warrants and affidavits, Hughes trial counsel took reasonable steps to ensure that the material was not admitted into evidence. Thus, counsel's conduct was not objectively unreasonable.

### 4. Allegation that Trial Counsel Conceded Murder During Closing Argument

■ Hughes argues that trial counsel was ineffective because counsel all but conceded the murder in closing argument. Hughes' trial counsel did not admit the murder. He first argued against a finding of guilty on the murder charge. He then argued that even if the jury found Hughes guilty of murder, the jury should not find the special circumstances. At that point, he said that if the murder wasn't committed in the course of a robbery or a kidnapping, or for financial gain, "it's just a murder. Just another horrible murder." Trial counsel's tactical decision to argue against the special circumstances change, as well as the murder charge, was not objectively unreasonable because a finding of special circumstances would result in a longer sentence for his client.

ince there is no merit to any of Hughes' contentions that his trial counsel's assistance was ineffective, Henrikson's refusal to raise the issue on appeal was not objectively unreasonable.

### B. *Alleged Failure to Resolve Inadequacies in the Record Before the California Court of Appeal*

Hughes contends that Henrikson's efforts to correct the record on appeal constituted ineffective assistance. In his argument to the California Superior Court on Hughes' motion for new trial, Hughes' trial counsel referred to Exhibit 26, which contained only the search warrant affidavit, as if it also contained the police report. Henrikson discovered that the clerk's copy of Exhibit 26 did not contain the police report. Instead, the police report was contained in Exhibit 21, with another search warrant and affidavit.

Henrikson made a motion in the superior court for a settled statement that Exhibit 26 had contained the police report or that the exhibit to which trial counsel meant to refer was Exhibit 21. At the hearing on the motion, Henrikson entered into a stipulation with the district attorney that Exhibit 21 contained the police report at the time it was submitted to the jury and that the same arguments that pertained to Exhibit 26 would pertain to Exhibit 21.

Hughes' contention that Henrikson should not have entered into the stipulation because it did not accurately reflect the events that occurred at trial lacks merit. Hughes essentially argues that the stipulation casts doubt on whether the police report was before the jury. Yet, the California Court of Appeal never questioned whether the report was before the jury, and the government conceded that the report and the affidavit in Exhibit 26 were improperly sent into the jury room. The district court was correct in concluding that the stipulation was meant only to ensure that the appellate court had the language of the report before it.

Hughes also argues that the alleged error caused the court of appeal to misstate the report. The court of appeal's decision did misstate the report, saying that the anonymous informant had overheard a conversation between Hughes and Cox, when in fact the report stated that the informant "overheard a conversation between a relative of George Hughes, and an uninvolved third party." However, the misstatement did not result from Henrikson's actions, but was entirely the court's own error. Therefore, Henrikson's efforts to correct the record on appeal were not objectively unreasonable.

### C. *Alleged Defective Preparation of Petition for Review in California Supreme Court*

Hughes argues that Henrikson ineffectively prepared his petition for review in the California Supreme Court. He argues that the petition's discussion of the seizure of Hughes' diary was incomprehensible. We find Henrikson's argument on the diary seizure issue well within the wide range of reasonable professional assistance. In the petition Henrikson alleged that the diaries were seized pursuant to an overbroad warrant and that a large part of the incriminating evidence introduced at trial resulted from the seizure. In the brief in support of the petition, Henrikson discussed thoroughly the diary seizure in seventeen pages of argument with case citations. The quality of these arguments was not objectively unreasonable.

Hughes also argues that Henrikson's citations to the trial transcript did not support Henrikson's arguments. Our review of the trial transcript, however, reveals that Henrikson's citations reasonably support the petition's arguments. Therefore, the quality of Henrikson's petition for review in the California Supreme Court was not objectively unreasonable.

### III. *Failure to Instruct on Intent to Kill*

Hughes contends that his right to due process was violated when the trial court refused to instruct the jury that intent to kill must be established in a felony murder special circumstances conviction. We reject this claim.

In 1983, the California Supreme Court construed the statutory language defining a felony murder special circumstance conviction to require an intent to kill or to aid

in the killing. *Carlos v. Superior Court,* 35 Cal.3d 131, 197 Cal.Rptr. 79, 86, 672 P.2d 862, 869 (1983). Subsequently, the California Supreme Court expressly over-ruled *Carlos* and held that a special in-struction on intent to kill as an element of felony murder special circumstances is re-quired only when the jury could find that the defendant was an accomplice rather than the actual killer. *People v. Anderson,* 43 Cal.3d 1104, 240 Cal.Rptr. 585, 610, 742 P.2d 1306, 1331 (1987).

*Anderson* was given retroactive applica-tion in *People v. Poggi,* 45 Cal.3d 306, 246 Cal.Rptr. 886, 753 P.2d 1082 (1988). In *Poggi,* the defendant argued that retroac-tive application of *Anderson* violated feder-al due process rights. The California Su-preme Court determined that its construc-tion of the statute was not so unforesee-able as to deprive the defendants of fair warning that their conduct would be held illegal. The court stated:

> Defendant stands convicted of a murder that preceded *Carlos. Carlos* itself con-cluded that the statute was ambiguous with respect to the requirement of intent to kill for a felony-murder special circum-stance. There was ample basis for pre-*Carlos* foreseeability of a holding that such intent is not required for the actual killer.

*Id.,* 246 Cal.Rptr. at 899, 753 P.2d at 1094–95 (citations omitted). In determining that there was pre-*Carlos* foreseeability, the court cited to *Anderson* in which it had discussed extensively the pre- and post-*Carlos* authority opposing the statutory construction adopted in *Carlos. Anderson,* 240 Cal.Rptr. at 604–10, 742 P.2d at 1325–31.

In this case, no evidence supported a theory that Hughes was an accomplice to Washington's murder. Thus an intent to kill instruction was not required under *Anderson.* Hughes was convicted in 1982, prior to the decisions in *Carlos* and *Anderson.* Retroactive application of *Anderson* in this case does not violate Hughes' due process rights because it was foreseeable in 1982 that intent to kill was not a requirement for a felony murder spe-cial circumstances conviction. *Poggi,* 246 Cal.Rptr. at 898–900, 753 P.2d at 1094–95.

## CONCLUSION

Hughes' claim that his sixth amendment rights were violated by the presence of extraneous material in the jury room lacks merit. Much of the extraneous material was duplicative of evidence properly admit-ted at trial. Although some of the extrane-ous material was not duplicative, and had the potential to prejudice Hughes' defense, the existence of other evidence which over-whelmingly established Hughes' guilt ren-ders the error harmless. Hughes' claim of ineffectiveness of appellate counsel fails because he cannot demonstrate that his counsel's performance was objectively un-reasonable. Finally, we reject Hughes' due process claim because the trial court was not required to instruct the jury on intent to kill under the circumstances of this case.

AFFIRMED.