Fernando **BELMONTES, pr,**
**Petitioner–Appellant,**

v.

Jeanne S. **WOODFORD, Warden, for**
**the California State Prison at San**
**Quentin, Respondent–Appellee.**

No. 01–99018.

United States Court of Appeals,
Ninth Circuit.

Feb. 5, 2004.

Christopher H. Wing, Esq., Sacramento, CA, Eric S. Multhaup, Esq., Mill Valley, CA, for Petitioner–Appellant.

Mark Anthony Johnson, Esq., Sacramento, CA, for Respondent–Appellee.

Before REINHARDT, O'SCANNLAIN, and PAEZ, Circuit Judges.

**ORDER**

The panel has voted to deny the petition for panel rehearing and petition for rehearing en banc. Judge O'Scannlain would grant the petition for panel rehearing and the petition for rehearing en banc.

The full court was advised of the petition for rehearing en banc. A judge requested a vote on whether to rehear the matter en

banc. The matter failed to receive a majority of the votes of the nonrecused active judges in favor of en banc reconsideration. FED. R. APP. P. 35.

The petition for rehearing en banc is denied.

CALLAHAN, Circuit Judge, with whom Circuit Judges O'SCANNLAIN, TROTT, KLEINFELD, GOULD, TALLMAN, BYBEE and BEA join, dissenting from denial of rehearing en banc:

I respectfully dissent from the order denying rehearing en banc.

In 1982, a jury found Fernando Belmontes guilty of first-degree murder for beating a nineteen-year-old woman to death with a dumbbell bar and sentenced him to death.[1] On automatic appeal to the California Supreme Court, Belmontes argued, *inter alia*, that the trial court misinstructed the jury on the proper role of sympathy and general character and background evidence during the trial's penalty phase. *See People v. Belmontes ("Belmontes I")*, 45 Cal.3d 744, 799, 248 Cal. Rptr. 126, 755 P.2d 310 (1988), *cert. denied*, 488 U.S. 1034, 109 S.Ct. 848, 102 L.Ed.2d 980 (1989). The supreme court, properly viewing the jury instructions and arguments as a whole, concluded that "no legitimate basis" existed for believing that the trial court had misled the jury. *Id.* at 802, 248 Cal.Rptr. 126, 755 P.2d 310.

Now, twenty-one years after Belmontes' trial and fifteen years after the California Supreme Court's ruling, the panel's decision reverses Belmontes' sentence. In doing so, the panel majority concludes that the trial court had, in fact, misinstructed the jury regarding its sentencing responsibilities. *Belmontes II*, 350 F.3d at 908. This conclusion is in error for three rea-

sons. First, the panel's conclusion defies the record and clear Supreme Court precedent. Second, as Judge O'Scannlain notes in his dissent, the panel's conclusion undermines the "strong policy against retrials years after the first trial where the claimed error amounts to no more than speculation." *Belmontes II*, 350 F.3d at 915(citing *Boyde v. California*, 494 U.S. 370, 380, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990)). Third, the panel reaches its conclusion despite the California Supreme Court's unanimous conclusion that "no legitimate basis" existed for believing that the trial court misled Belmontes' jury about its sentencing responsibilities. *Belmontes I*, 45 Cal.3d at 802, 248 Cal.Rptr. 126, 755 P.2d 310.

I

Under the Eighth Amendment, a jury must consider all relevant mitigating evidence that a defendant presents to it and afford that evidence such weight as it deems appropriate. *Penry v. Johnson*, 532 U.S. 782, 797, 121 S.Ct. 1910, 150 L.Ed.2d 9 (2001). Simply allowing a defendant to present mitigating evidence to the jury is not enough. *Penry v. Lynaugh*, 492 U.S. 302, 319, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). A jury must be able to consider, and may not refuse to consider, any constitutionally relevant mitigating evidence. *Buchanan v. Angelone*, 522 U.S. 269, 276, 118 S.Ct. 757, 139 L.Ed.2d 702 (1998). Such mitigating considerations include looking at a defendant's past behavior and drawing favorable inferences about his probable future conduct. *Skipper v. South Carolina*, 476 U.S. 1, 4–5, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986).

---

1. Specifically, the jury convicted Belmontes of first-degree murder with special circumstances. It made special findings that Belmontes was the actual killer and that he had the specific intent that death occur. *Belmontes v. Woodford ("Belmontes II")*, 350 F.3d 861, 873 (9th Cir.2003).

Belmontes argues, and the panel agrees, that the trial judge erred in this regard by not advising the jury to consider the portion of his mitigating evidence that tended to show that he would adapt well to prison and would become a constructive member of society if granted a life sentence. In order for Belmontes to prevail on this argument, "a reasonable likelihood" must exist that the jury understood the court's instructions in a way that caused it not to consider this constitutionally relevant evidence. *Boyde*, 494 U.S. at 380, 110 S.Ct. 1190. Contrary to the panel's decision, no such reasonable likelihood exists.

### A

The trial judge began instructing the jury by stating that "it shall consider all of the evidence which has been received during any part of the trial of this case, except as you may be hereafter instructed." The judge then read an enumerated list of seven mitigating circumstances. The last circumstance, the so-called "factor (k)," instructed the jurors to consider "[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime."

The Supreme Court has interpreted factor (k) as specifically directing a jury "to consider *any other circumstance* that might excuse the crime, which certainly

includes a defendant's background and character." [2] *Boyde*, 494 U.S. at 382, 110 S.Ct. 1190; *see also Buchanan*, 522 U.S. at 277, 118 S.Ct. 757 (concluding that, by directing the jurors to base their decision on "all the evidence," that the instruction properly allowed the jurors to consider any mitigating evidence). The panel, however, concludes that these instructions, by their plain language, do not encompass events or considerations unrelated to Belmontes' culpability, particularly forward-looking considerations such as Belmontes' future conduct if sentenced to life in prison. *Belmontes II*, 350 F.3d at 901. This conclusion is wrong.

As just noted, the Supreme Court has told us that factor (k) instructs the jury to consider a defendant's background and character. *Boyde*, 494 U.S. at 382, 110 S.Ct. 1190. The Court has further noted that a jury's consideration of "a defendant's past conduct as indicative of his probable future behavior is an *inevitable* and not undesirable element of criminal sentencing." *Skipper*, 476 U.S. at 5, 106 S.Ct. 1669 (emphasis added). If any doubt remained, the judge here further clarified the sentencing instructions and factor (k) by informing the jury that "the mitigating circumstances which I have read for your consideration are given to you *merely as examples* of some of the factors that you

---

**2.** Our recent decision in *Payton v. Woodford*, 346 F.3d 1204 (9th Cir.2003) (en banc), does nothing to change this conclusion. Factor (k) was ambiguous under the specific facts of *Payton*. We reached that conclusion only by carefully distinguishing *Boyde*. *See Payton*, 346 F.3d at 1211–12.

We distinguished *Boyde* on two grounds. First, *Payton* concerned *"post*-crime" mitigating evidence. *Boyde* (not to mention *Belmontes II*) concerned *"pre*-crime" evidence. Second, the prosecutor in *Payton* "repeatedly stated to the jury that factor (k) did *not* encompass Payton's mitigating evidence of his religious conversion and good behavior in prison." *Id.* at 1212. The prosecutor in

*Boyde* never suggested to the jury that it could not consider mitigating evidence of character and background. *See Boyde*, 494 U.S. at 385, 110 S.Ct. 1190. Now, in *Belmontes II*, the prosecutor *explicitly told the jury* that it should consider Belmontes' religious experience, his future value to the community and his ability to work with other prisoners when determining his sentence.

Thus, for the very reasons that *Boyde* did not control *Payton*, *Payton* does not now control *Belmontes*. Holding otherwise ignores our own en banc description of Supreme Court precedent. This misapplication high-lights the danger and implications of the panel's decision.

may take into account as reasons for deciding not to impose a death penalty or a death sentence upon Mr. Belmontes." *Belmontes II,* 350 F.3d at 897 (emphasis added).

The panel contends that the trial judge effectively undid any clarity that Belmontes' jury instructions had achieved by giving a "superceding qualifying directive." *Id.* at 902. Specifically, the panel points to the judge's following instructions: "You should pay careful attention to each of these factors. Any one of them standing alone may support a decision that death is not the appropriate punishment in this case." According to the panel, a juror who followed these instructions would think that he or she could not consider nonstatutory mitigating evidence, namely, that the juror could not consider testimony tending to show that Belmontes would lead a constructive life in prison. *Id.* The panel thus suggests that the last two sentences of the jury instructions caused the jury to completely ignore the preceding sentences. This interpretation defies logic.

Nothing in the jury instructions was contradictory. The judge enumerated seven mitigating *circumstances.* He told the jury that those enumerated *circumstances* were "examples of some of the *factors* " that the jury should consider. The judge told the jury that he had given them *examples* of factors—examples to which the jury should pay careful attention and examples that, standing alone, could support a decision that death is not appropriate. Nowhere did the judge limit the jury to considering only the enumerated mitigating circumstances. Rather, he told them just the opposite.

We presume that a jury follows its instructions. *Weeks v. Angelone,* 528 U.S. 225, 234, 120 S.Ct. 727, 145 L.Ed.2d 727 (2000). We therefore must presume that the jury knew that the enumerated circumstances were "examples" of mitigating factors. The surrounding record further supports this presumption.

## B

Even assuming, *arguendo,* that one might consider the court's jury instructions to be ambiguous, the jury did not reach its verdict in a vacuum. For this reason, we look to the mitigating evidence introduced into the record to discern what evidence the jury considered when faced with the allegedly ambiguous instructions. *Boyde,* 494 U.S. at 384, 110 S.Ct. 1190(stating that "the introduction without objection of volumes of mitigating evidence certainly is relevant to deciding how a jury would understand an instruction which is at worst ambiguous."). Here, the panel's own interpretation of the record suggests that the jury must have considered Belmontes' future potential as a life prisoner.

As the panel states, Belmontes put on "substantial" evidence that he could become a model prisoner and would not pose a future danger. *Belmontes II,* 350 F.3d at 907. Belmontes personally addressed the jury, asking the jurors to spare his life and to give him "an opportunity to achieve goals and try to better [him]self." *Id.* at 876 (alteration in original). In an "emotional closing argument," Belmontes' defense counsel "asked the jury to spare Belmontes' life on the ground that he would make positive contributions if allowed to live out his natural life in prison." *Id.* at 907. It is hard to imagine that the defense could have presented the issue of life or death more poignantly. Perhaps most telling, however, the *prosecution* told the jury that it should consider Belmontes' religious experience, his future value to the community and his ability to work with other prisoners when determining his sentence. *See id.* at 910–11 (O'Scannlain, J., dissenting).

Thus, at least four aspects of the penalty phase indicate that the jury considered forward-looking evidence of Belmontes' future: (1) the "substantial" evidence regarding Belmontes' character, (2) Belmontes' personal plea for the jury to allow him to improve himself, (3) the defense *and* prosecution's directions to consider the forward-looking evidence and (4) the court's instruction to consider all evidence presented. The panel nevertheless concludes that the jury was confused about whether it should consider the evidence presented. As Judge O'Scannlain points out, this conclusion turns the entire proceeding "into a virtual charade." *Id.* at 914–15 (citing *Boyde,* 494 U.S. at 383, 110 S.Ct. 1190).

### C

The panel also concludes that a series of questions between individual jurors and the judge during deliberations proves that the jurors were confused. This interpretation reads far more into the exchange than existed.

After the jury had deliberated for several hours, Juror Hern asked the judge, "[t]he statement about the aggravation and mitigation of the circumstances, now, that was the listing?" The court responded, "[t]hat was the listing, yes, ma'am." She then asked, "[o]f those certain factors we were to decide one or the other and then balance the sheet?" The court answered: "[t]hat is right. It is a balancing process." Shortly thereafter, Juror Hailstone asked whether it was "possible that [Belmontes] could have psychiatric treatment during this time?" The judge responded: "That is something that you cannot consider in making your decision."

The panel does not contend that the judge's answers were wrong. Rather, the panel concludes from this limited exchange that it is "clear that at least one juror believed that the jury should consider ...

only 'those certain factors' that appeared in 'the listing.'" *Belmontes II,* 350 F.3d at 903. With all due respect to the panel, I read the judge and jury's colloquy far differently.

Juror Hern asked whether the jury should consider the "statement about the aggravation and mitigation of the circumstances." Notably, that "statement" explicitly told the jurors that the mitigating factors were nonexclusive. The judge correctly answered "yes." Juror Hern then asked if she should balance those factors. The judge again correctly answered in the affirmative. Juror Hailstone finally asked if Belmontes could have psychiatric treatment. The judge responded, once again correctly, that the jury cannot consider such testimony. *See Hughes v. Borg,* 898 F.2d 695, 700(9th Cir.1990) (noting that jurors can consider only evidence presented at trial).

Jurors are permitted under law to ask questions; the mere asking of questions, however, does not establish juror confusion. In fact, these questions just as easily show that the jury was taking its duty seriously before reaching a verdict. Appellate courts should not speculate why a juror asked a particular question.

Even if we assume, for the sake of argument, that the jurors were confused when they asked their questions, we must also presume that the jury understood the judge's answers. *See Weeks,* 528 U.S. at 234, 120 S.Ct. 727. Furthermore, even if the jurors remained confused after their discussion with the judge, he instructed the jury "to go over the instructions again." The jury returned to deliberations and did not return with further questions. "Had the jury desired further information, they might, and probably would, have signified their desire to the Court. The utmost willingness was manifested to gratify them, and it may fairly be presumed that

they had nothing farther to ask." *Armstrong v. Toler*, 11 Wheat. 258, 279, 6 L.Ed. 468 (1826). To presume otherwise "would require reversal every time a jury inquires about a matter of constitutional significance, regardless of the judge's answer." *Weeks*, 528 U.S. at 234, 120 S.Ct. 727.

The panel takes a few isolated incidents and amplifies them into a constitutional infirmity. This ignores the Supreme Court's observation that "[j]urors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might." *Boyde*, 494 U.S. at 380–81, 110 S.Ct. 1190. To the extent that jurors have different interpretations of the instructions, these differences "may be thrashed out in the deliberative process, with commonsense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting." *Id.* at 381, 110 S.Ct. 1190. Unfortunately, technical hairsplitting and subtle parsing of the instructions is exactly how the panel reaches its conclusion.

## II

This is not the first time that courts have had occasion to examine whether Belmontes' jury was confused about its duty to consider all mitigating evidence. More than fifteen years ago, Belmontes argued to the California Supreme Court that the trial court had misinstructed the jury on the proper role of sympathy and general character and background evidence in the penalty phase. As Judge O'Scannlain notes in his dissent, Belmontes presented only character and background evidence to the jury. *Belmontes II*, 350 F.3d at 909. Belmontes' character and background thus provided the only possible basis for the jury to conclude that Belmontes could still be a productive member of society. The California Supreme Court concluded that the jury had understood its duty to consider such evidence.

In reaching its decision, the state supreme court noted that the judge had instructed the jury that "the mitigating circumstances which I have read for your consideration are given to you *merely as examples* of some of the factors that you may take into account as reasons for deciding not to impose a death sentence upon Mr. Belmontes." *Belmontes I*, 45 Cal.3d at 801, 248 Cal.Rptr. 126, 755 P.2d 310 (emphasis in original). The court then noted that "[t]he prosecutor's argument reinforces our conclusion that, as instructed, the jury must have fully understood its obligation to weigh all of the defendant's mitigating evidence." *Id.* While the California Supreme Court did not examine the specific question of whether the jury considered Belmontes' potential to adapt to prison and become a constructive member of society, it did examine the broader question of whether the jury had considered Belmontes' character and background. From this examination, the California Supreme Court concluded that "no legitimate basis" existed for finding that the jury did not understand its obligations.[3] *Id.* at 802, 248 Cal.Rptr. 126, 755 P.2d 310. Now, fifteen years later, the panel reexamines whether the jury considered all of the constitutionally relevant mitigating evidence.

The California Supreme Court not only reached a considered conclusion, but it had the benefit of a record that was fifteen years younger. As a federal habeas court, we "should, of course, give great weight to the considered conclusions of a coequal state judiciary." *Miller v. Fenton*, 474 U.S. 104, 112, 106 S.Ct. 445, 88 L.Ed.2d

**3.** Notably, the district court also concluded that the jury had considered all mitigating factors. The present appeal is from this decision.

405 (1985). The panel instead "strains mightily—and unpersuasively—to perceive constitutional error in the comprehensive and perfectly proper jury instructions given by the state trial judge." *Belmontes II,* 350 F.3d at 908 (O'Scannlain, J., dissenting).

### III

The panel labels Belmontes' crime as not "especially heinous." In doing so, it theorizes that, given the allegedly innocuous nature of the crime, the jury would not have sentenced Belmontes to death had it understood its duties. The panel's characterization of the murder greatly distorts the record.

Belmontes struck nineteen-year-old Steacy McConnell fifteen to twenty times in the head with an iron dumbbell bar, a bar that he brought with him to her house. An expert testified that the blows would have sounded "like a cracked pot." Steacy also suffered defensive injuries to her arms, legs and feet; she apparently attempted to ward off this brutal attack, but to no avail. After delivering these fatal blows, Belmontes still had the wherewithal to take Steacy's stereo equipment and explain to his accomplices simply that he "had to take out a witness." *Belmontes II,* 350 F.3d at 870. Later that day, Belmontes sold Steacy's stereo for $100 and bought some beer.

Meanwhile, Steacy's parents found their daughter lying unconscious in a pool of blood. She died shortly afterward from cerebral hemorrhaging caused by the blows to her head. This was not a simple "robbery gone wrong."

The record also presents a decidedly mixed picture of Belmontes' character and background, on which the panel relies so heavily. The jury heard testimony that Belmontes "thrived in the structured, institutional environment of prison." *Id.* at 907. They also heard that Belmontes at-tempted to swing a chair at another ward while he was in the structured, institutional environment of the California Youth Authority. *Id.* at 873. The jury heard that Belmontes had been "good at counseling young inmates not to repeat the mistakes that he had made." *Id.* at 907. They also heard that Belmontes pleaded guilty to being an accessory after the fact to voluntary manslaughter and that he had battered and attempted to choke his pregnant girlfriend, causing her to drop their infant daughter. *Id.* at 873.

Belmontes may have achieved occasional, moderate success in prison. The record also provided, however, ample aggravating evidence for the jury to sentence him to death. Belmontes did, after all, savagely beat an unarmed nineteen-year-old woman with a dumbbell bar and leave her to die.

### IV

Capital cases are always difficult. Our system of justice asks jurors to perform the most difficult tasks imaginable: to resolve credibility, to determine guilt or innocence, and to decide between life and death. Jurors perform these duties viewing the evidence and the defendant firsthand.

This court should not now undo the deliberative process by second-guessing a decision that was squarely within the jury's province. The panel, unfortunately, does just that. It dissects a twenty-one-year-old record to second-guess the jury's decision. In doing so, it finds a "reasonable likelihood" of error where a state supreme court and a United States district court found none. It finds error by misinterpreting United States Supreme Court precedent that demands a different result. It finds error in a way that undermines finality in criminal cases by ignoring the "strong policy against retrials years after the first trial where the claimed error

amounts to no more than speculation." *Boyde*, 494 U.S. at 380, 110 S.Ct. 1190. Simply put, the panel finds constitutional error where none exists.

For these reasons, I dissent.

BEA, Circuit Judge, with whom Circuit Judge TALLMAN joins, dissenting from denial of rehearing en banc:

I join Judge Callahan in her dissent from the denial of rehearing *en banc*. Additionally, I also respectfully dissent from the order denying rehearing *en banc* with the following comments:

First, the majority errs in finding that the trial court did not properly **character-ize** Belmontes' evidence as "mitigating."

> The trial judge refused to read the most important part of the requested instruction, which stated: '[Y]ou should not limit your consideration of mitigating circumstances to these specific factors. You may also consider any other circumstances ... as reasons for not imposing the death sentence.' The jury was not informed that it should consider mitigating evidence bearing on Belmontes' probable future conduct if sentenced to life in prison without the possibility of parole.... Rather than instruct the jurors that it was their duty to consider and, if appropriate, give effect to, all of the mitigating evidence presented by the defendant....

335 F.3d at 1040.

By this language, the majority determines that Belmontes' testimony and that of his witnesses **constituted** "mitigating evidence." A trial court cannot so instruct a jury.

The proposed instruction would have constituted a comment by the trial judge that he considered Belmontes' proffered evidence to *be* mitigating evidence. Judges are not supposed to make such comments about the evidence. The jury is the sole and exclusive judge of the credibility and weight of the evidence.[1] To instruct the jury as the majority says should have been done would have constituted a charge that Belmontes' proffered evidence constituted mitigating evidence. Only where reasonable persons must accept the credibility of the evidence and its weight would such a characterization be proper. Such an instruction would amount to a directed verdict on an issue.

Such instruction also would have been argumentative. A trial judge should not pick and choose from the evidence and tell the jury what evidence to consider on an issue. That is the function of counsel.

Second, the majority repeatedly misquotes and mischaracterizes the language of "factor (k)" to narrow its application only to factors *preceding* the commission of the crime. The actual language of factor (k) is much broader; it allows consideration of evidence that predicts Belmontes' actions in jail.

The majority correctly quotes the language of "factor (k)" to allow the jury to consider "[a]ny other circumstance which extenuates the gravity of the crime even

---

1. The majority's proposed instruction is directly contrary to the jury instruction given triers of fact daily in California trial courts:

    You are the sole and exclusive judges of the believability of the witnesses and the weight to be given the testimony of each witness. In determining the believability of a witness you may consider any matter that has a tendency reasonably to prove or disprove the truthfulness of the testimony of the wit-

    ness, including but not limited to the following:

    The demeanor and manner of the witness while testifying; The character and quality of that testimony; ... The existence or non existence of a bias, interest, or other motive; A statement previously made by the witness that is [consistent] [or] [inconsistent] with the testimony of the witness; ... CAL. BAJI 2.20.

though it is not a legal excuse for the crime," but then interprets that language to mean "petitioner's culpability for the crime he committed." 335 F.3d at 1061–62. "Most naturally read, this instruction allows the jury to consider evidence that bears upon the commission of the crime by the defendant and excuses or mitigates his culpability for the offense.... By its plain language, however, the instruction does not encompass events or considerations that are unrelated to the defendant's culpability." *Id.* at 1064.

By changing the language of the instruction from "extenuates the *gravity* of the crime ..." to "*culpability* for the crime," the majority shrinks the focus to factors which must have occurred before or at the time of the commission of the crime. But that is not an accurate reading of the phrase "extenuates the gravity of the crime." "Extenuate" means: "To lessen, to diminish; to weaken.... To lessen or seem to lessen the seriousness (of an offense, *guilt,* etc.) by giving excuses or serving as an excuse." WEBSTER'S UNABRIDGED DICTIONARY (2d ed.1979) (emphasis added).

Indeed, "extenuate" is given a much broader meaning by factor (k) than by the dictionary: it includes something that can lessen guilt but does *not* constitute a legal excuse. For example, as I read factor (k), it would include restitution paid to the victim by a thief after he was caught.

I would suggest that the language "gravity of the crime" focuses not only on the culpability of the criminal, but includes the effect on society in general. To the extent that the criminal taunts or gloats after his crime, the gravity of the crime is enhanced. To the extent that the criminal shows remorse, repents or rehabilitates himself, the gravity of the crime is diminished.

The majority does not agree, but it disagrees *only* after changing the language of

factor (k), as noted above: "Moreover, unlike in *Boyde,* 'society' has not had a 'long held view' that a defendant's likely future conduct can serve to mitigate or excuse his commission of a serious crime. Rather, the doctrine is a legal concept peculiar to capital punishment cases." 335 F.3d at 1064.

The majority is again talking about the *commission* of a crime, not the *gravity* of the crime. All mitigation for the *commission* of a crime must precede its execution; the circumstances that extenuate the *gravity* of a crime do not necessarily precede its execution.

Practically all that has to be said is said quite well by Judge O'Scannlain:

Likewise, because factor (k) allows the jury to consider Belmontes's character and background, there is no reason to think that the jury would have thought it was foreclosed from using such information to consider his future potential if sentenced to life in prison. As the Supreme Court has noted, "Consideration of a defendant's past conduct as indicative of his probable future behavior is an *inevitable* and not undesirable element of criminal sentencing." *Skipper,* 476 U.S. at 5, 106 S.Ct. 1669, 90 L.Ed.2d 1(emphasis added); *see Boyde,* 494 U.S. at 382, 110 S.Ct. 1190, 108 L.Ed.2d 316 ("Petitioner had an opportunity through factor (k) to argue that his background and character 'extenuated' or 'excused' the seriousness of the crime, and we see no reason to believe that reasonable jurors would resist the view, 'long held by society,' that in an appropriate case such evidence would counsel imposition of a sentence less than death."); *cf. Johnson,* 509 U.S. at 370, 113 S.Ct. 2658, 125 L.Ed.2d 290.

335 F.3d at 1073.

The majority has taken a defense *argument* (good pre-trial conduct establishes

hope for good future conduct) and elevated it into a *required instruction.* Nothing in the law requires or allows that.