UNITED STATES of America, Plaintiff,

v.

**Rafael CARO–QUINTERO, et al., Defendants.**

CR 87–422(F)–ER.

United States District Court, C.D. California.

July 18, 1991.

As Corrected July 26, 1991.

Gary A. Feess, U.S. Atty. by Manuel A. Medrano, John L. Carlton, Asst. U.S. Attys., Los Angeles, Cal., for plaintiff.

Martin R. Stolar, Michael J. Burns, Adolfo Z. Aguila, New York City, for defendant Juan Ramon Matta–Ballesteros Del Pozo.

Mitchell, Silberberg & Knupp by Edward M. Medvene, James Blancarte, Ronald Di Nicola, Los Angeles, Cal., for defendant Ruben Zuno–Arce.

Mary Kelly, Bel Air, Cal., Bridgman, Mordkin, Gould & Shapiro, Inc. by Michael S. Meza, Fountain Valley, Cal., for defendant Juan Jose Bernabe–Ramirez.

Federal Litigators Group by Gregory Nicolaysen, Beverly Hills, Cal., for defendant Javier Vasquez–Velasco.

## MEMORANDUM DECISION

RAFEEDIE, District Judge.

This matter came for hearing on defendants' motions for new trial based upon

allegations of jury misconduct. The Court, having read and considered all the papers filed regarding those motions and having considered oral argument, gave an oral ruling at the hearing denying defendants' motions, stating a summary of its reasons. The Court issues this memorandum decision to set forth in fuller detail the reasons for the Court's denial of the motions.

## INTRODUCTION

This cause came before the Court on defendants' motions for a new trial for juror misconduct pursuant to Federal Rule of Criminal Procedure 33. The motion was originally brought as a single motion filed jointly by all four defendants in this case. All four were convicted by a jury verdict which they now wish to impeach.

During the course of jury deliberations and after three verdicts had already been rendered, it came to the Court's attention a newspaper was seen, by the court reporter, in the jury deliberation room. The reporter was in the jury room by stipulation of the parties reading back testimony from the daily transcript. At that time, the Court conducted *in camera* questioning of the jurors to determine whether there had been any exposure to newspaper articles concerning the trial. Upon finding no evidence of such exposure and with the concurrence of counsel, the Court, ordered resumption of the jury to deliberations. A transcript of the *in camera* proceedings was ordered to be provided to counsel for all four defendants.

After the return of the final verdict, defendants jointly filed an omnibus motion for a new trial based upon allegations of juror misconduct. The motion is based primarily, if not entirely upon the declaration of one of the jurors, juror William Parris.

### Procedural History

This is the second trial of multiple defendants in this Court relating to the indictment of nineteen individuals for the kidnapping, torture and murder of Drug Enforcement Agency Special Agent Enrique Ca-

marena–Salazar and his pilot Alfredo Zavala–Avelar, as well as other acts in furtherance of a racketeering enterprise. The present action involves four individuals named in the indictment: Juan Ramon Matta–Ballesteros, Ruben Zuno–Arce [1], Juan Jose Bernabe–Ramirez, and Javier Vasquez–Velasco.

On May 8, 1990, jury selection commenced in this action. During the voir dire process, the Court individually questioned each juror extensively regarding exposure to media reports about the case and secured unequivocal promises from each juror that they would decide the case solely upon the evidence presented at the trial. The Court repeatedly stressed the media reports were not evidence.

On May 11, 1990, jury selection was completed and the jury was sworn. The trial commenced immediately thereafter. Prior to the morning recess on the first day of trial, and repeated in substance throughout the trial on a daily basis, the Court issued a cautionary instruction to the jury telling them not to read, hear or listen to news reports about the case or to otherwise discuss the case with anyone.

On July 16, 1990, the jury was instructed on the law by the Court and immediately commenced deliberation. The jury returned guilty verdicts against Juan Ramon Matta Ballesteros on Thursday, July 26, 1990 (after 9 days of deliberations), against Juan Jose Bernabe–Ramirez on Monday, July 30, 1990 (after 2 additional days of deliberations (total of 11 days)), against Ruben Zuno–Arce on Tuesday, July 31, 1990 (after 1 additional day of deliberation (total of 12 days)), and against Javier Vasquez–Velasco on Monday, August 6, 1990 (after 4 additional days of deliberations (total of 16 days)).

On Wednesday, August 1, 1990, after the Zuno verdict was returned, but while the jury was deliberating on the Velasco verdict, the jury requested that certain trial testimony be read back to the jury from a

---

**1.** Subsequent to the Court's denial of this motion, the Court granted defendant Zuno–Arce a new trial on other grounds.

daily transcript that had been prepared. The parties stipulated that the reporter be permitted to read in the jury room rather than convene in formal session of the Court. Upon entry into the jury room, the court reporter noticed newspapers in the jury room, which was not reported to the Court until the following day.

On Thursday, August 2, 1990, the Court conducted an *in camera* inquiry into the presence of newspapers in the jury room. The Court had the jury room searched for newspapers and any other extrinsic evidence that might be present. There were a number of newspapers and sections from newspapers in the room. None had any stories relating to the case. All papers and sections were removed and preserved by the court. One of the papers recovered had one page missing. That page corresponds to the page containing an article about the trial on that day.

The Court individually questioned the jurors, outside the presence of the other jurors. Each juror unequivocally stated that she or he had not read the article seen by the court reporter nor had they seen any other juror reading the article. Each juror stated that newspapers had been brought into the jury room throughout the trial and deliberations. However, each juror also stated that she or he had not read any article about the case nor had any other juror been seen reading any articles about the case.

After the conclusion of the *in camera* questioning, the Court called the entire jury into the courtroom and instructed them that they were not to read or listen to anything about the trial and instructed them that they should consider only the evidence offered at trial. The jury returned to deliberations that day, Thursday, August 2, 1990. The verdicts on the final defendant, Javier Vasquez–Velasco, were handed down on Monday, August 6, 1990 at 11:55 a.m.

On August 20, 1990 defendants filed this joint motion for a new trial based upon juror misconduct. The focal point of the motion was the declaration of juror Parris submitted in support of the motion. The declaration recites a lengthy list of topics the jury allegedly discussed but which could not have been known but for exposure to information extrinsic to the trial.

Defendants contended the Court could decide the motion based solely upon the declaration of juror William Parris. The government opposed the motion and argued an evidentiary hearing was appropriate to test the credibility of juror Parris. In light of the allegations and in response to defendants' motion for a new trial, the Court determined that an evidentiary hearing was necessary to determine exactly what the jurors were exposed to and, if so, at what time during the trial or deliberations the jurors were exposed to information.

## DISCUSSION

This memorandum begins with a discussion of the Court's reasoning for holding the evidentiary hearing and how the Court conducted the hearing. This is followed by the Court's findings of fact and analysis as to each alleged extrinsic exposures.

I. Evidentiary Hearing

 A. Necessity of an Evidentiary Hearing.

"It is axiomatic that fundamental to the administration of justice is a fair and impartial jury." *United States v. Bagnariol,* 665 F.2d 877, 884 (9th Cir.1981) (*citing Turner v. Louisiana,* 379 U.S. 466, 472–73, 85 S.Ct. 546, 549–50, 13 L.Ed.2d 424 (1965)). The introduction of outside influences into the deliberative process of the jury is inimical to our system of justice. *Remmer v. United States,* 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954).

The jury should reach its decisions only upon the evidence produced at trial, subject to judicial control and the rules of evidence, and unaffected by extrinsic facts and influences. *Bagnariol, supra* at 884. "The trial court, upon learning of a possible incident of juror misconduct, must hold an evidentiary hearing to determine the precise nature of the extraneous information." *Id.* at 885. The Ninth Circuit phrased the test differently in *U.S. v. Madrid,* 842 F.2d

1090 (9th Cir.1988). The court said that a district court, upon finding a reasonable possibility of prejudice, needs to hold a fair hearing. *Id.* at 1094 (*citing Remmer v. U.S.*, 350 U.S. 377, 76 S.Ct. 425, 100 L.Ed. 435 (1981)).

▮ Not every allegation that extraneous information has reached the jury requires a full-dress hearing. *U.S. v. Halbert*, 712 F.2d 388, 389 (9th Cir.) *cert. denied*, 465 U.S. 1005, 104 S.Ct. 997, 79 L.Ed.2d 230 (1984) (hearing not required where the trial court knew the exact scope and nature of the extraneous information). However, "[i]n order to ascertain if there existed a reasonable possibility that the verdict would have been affected, it [is] first necessary to know the precise quality of the jury breach." *U.S. v. Vasquez*, 597 F.2d 192, 194 (9th Cir.1979). A court must hold an evidentiary hearing to determine the precise nature of the extraneous information which actually made it to the jury when it is unclear exactly what may have come before the jury.

## B. Scope of an Evidentiary Hearing.

### ▮ *Format of the Hearing*

If an evidentiary hearing is held, it has two purposes. The first is to determine the truthfulness of the allegations of juror misconduct or prejudice. If the allegations are found to be true, the inquiry does not end there, . . . . The court must determine if the bias or prejudice amounted to a deprivation of the Fifth Amendment (due process) or Sixth Amendment (impartial jury) guarantees. 'The test is whether or not the misconduct has prejudiced the defendant to the extent that he as not received a fair trial.' [citations omitted].

*U.S. v. Hendrix*, 549 F.2d 1225, 1228–29 (9th Cir.1977). The extent of a hearing or the way a hearing is conducted is at the Court's discretion.

At the time the Court announced its intent to hold an evidentiary hearing, the Court gave a preliminary list of subjects the Court would inquire into at the hearing. The Court invited motions regarding other subjects and also invited the parties to propose questions to be asked at the hearing. On November 5, 1990, the Court conducted the evidentiary hearing concerning a limited number of the issues raised by juror Parris' declaration. The Court incorporated proposed questions submitted by the parties where it deemed the questions appropriate. Each juror was called into the courtroom and questioned separately. The jurors who had been questioned were kept separate from the jurors who had not yet been questioned.

### ▮ *Evidentiary Constraints*

▮ The trial judge, is limited by Fed. R.Evid. 606(b) as to what evidence may be considered when determining juror misconduct.[2] "The type of after-acquired information that potentially taints a jury verdict should be carefully distinguished from the general knowledge, opinions, feelings, and bias that every juror carries into the jury' room." *Hard v. Burlington Northern R. Co.*, 870 F.2d 1454, 1461 (9th Cir.1989). The court may consider only testimony regarding extraneous prejudicial information or improper outside influences. Statements or information relating to a juror's general knowledge, opinions, feelings, or bias can not be considered.

▮ This rule not only limits what may be considered, but also restricts the scope of inquiry into extraneous influences. Jurors can not be question about the subjective effects of the extraneous information. *Bagnariol, supra* at 884–85. A trial judge should not investigate the subjective effects of any such breach upon the jurors.

**2.** Fed.R.Evid. 606(b) reads:

Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror.

*U.S. v. Howard,* 506 F.2d 865, 869 (5th Cir.1975). "[The judge] should reach a judgment on his own without the benefit of juror opinions which might negate or affirm a conclusion of actual harm." *Vasquez,* 597 F.2d at 194.

Where affidavits or juror testimony or other evidence of juror statements are offered to impeach a verdict, the district court must examine this material to decide whether it falls within the categories of admissible testimony permitted by Rule 606(b). Rule 606(b) permits testimony only on the questions of 'whether *extraneous prejudicial information* was improperly brought to the jury's attention' and 'whether any *outside influence* was improperly brought to bear on any juror.' Jurors may not testify as to how they or other jurors were affected by the extraneous prejudicial information or outside influence; they may only testify as to its existence.

*Hard v. Burlington Northern R. Co.,* 870 F.2d 1454, 1461 (9th Cir.1989).

The policy behind this rule is to discourage harassment of jurors, insulate the jury room to facilitate free and open discourse, reduce opportunity and incentive for jury tampering, promote finality of verdicts, and respect the jury as the finder of fact. *See, McDonald v. Pless,* 238 U.S. 264, 267, 35 S.Ct. 783, 784, 59 L.Ed. 1300 (1915). In order to comply with this rule, the Court carefully constructed questions which would elicit the necessary information without violating the letter or the spirit of the rule. Because of the constraints imposed by the rule, the Court refused to use some of the questions proposed by the parties and also refused to base any of its decisions on statements or allegations that appeared to violate the rule.

### ■ *Credibility of Juror Parris' Declaration and Testimony.*

The Parris declaration presents an interesting problem for the Court because he does not confess to any acts of misconduct, but instead accuses other jurors of misconduct. Because Juror Parris does not admit to any misconduct, the Court must deter-

mine whether his allegations about the other jurors is in fact true. The testimony of juror Parris contradicts the testimony of the other jurors in almost every way. When juror Parris states the jury discussed information at certain times and in specific detail, the other jurors deny ever hearing or knowing about the subject, deny ever discussing it, or deny knowing or discussing details. The sworn testimony compels the Court to make a determination of credibility. Because of this, the Court finds itself in the unhappy position of evaluating a juror's credibility. There appears to be no other way to determine whether a breach occurred and whether the breach was prejudicial.

Juror Parris' declaration and testimony at the evidentiary hearing is not credible. The declaration and testimony must be contrasted with Parris' testimony at the *in camera* questioning on August 2. At the *in camera* questioning juror Parris stated that on a number of occasions he thought jurors had obtained information extrinsic to the trial. When questioned further he stated "whatever we've done, especially after the—after we have given our verdicts, there is a lot of discussion about that the next day." Juror Parris went on to discuss only events which transpired immediately after the Matta verdict. The Court gave juror Parris the opportunity to air any concerns he had. Parris spoke only of a single incident.

It is further difficult to find juror Parris' declaration and testimony at the evidentiary hearing to be believable in light of his emphatic responses to the Court's questioning at the *in camera* questioning which follows:

The Court: Well, were you in anyway affected in the way you have made your decisions in this case by any such discussions?

Mr. Parris: The only way I was affected is I went back and read the instructions again to see if I have, in fact—If i had been stupid.

And was I affected in my decision; No, I don't think I was.

The Court: You made your decision based on your conscientious belief that they were the right decisions?

Mr. Parris: Absolutely. Absolutely.

The Court: Do you think that's the case with the other jurors, as well?

Mr. Parris: I think so....

\* \* \* \* \* \*

The Court: Do you believe any of the jurors have been influenced ... to vote a certain way because of information brought in from the outside?

Mr. Parris: No, I don't.

*In Camera* Transcript at pp. 34–36.[3] These responses were given while the events and circumstances of the trial were still very real in the juror's mind. In fact, verdicts had already been returned as to three of the defendants, and the deliberations were not yet complete as to the last one. Juror Parris was questioned without prior knowledge or warning and without prior contact with any of the parties. The questions were asked by the Court and the Court was able to judge his demeanor.

It should be noted that at the time of the *in camera* hearing the Court immediately discerned an apparent antagonism between juror Parris and the other jurors. Despite this, juror Parris still testified that he thought verdicts reached had been unaffected by outside information. The Court believes the antagonism gives greater credence to the *in camera* testimony of Parris when he unequivocally affirmed the verdicts. For all purposes, he appeared to be telling the truth.

The emphatic responses to the *in camera* questioning must be contrasted with his responses at the evidentiary hearing. Whenever asked when the alleged discussions took place, juror Parris was never able to pin-point the time during the trial the discussion took place. At one point during the questioning the following took place:

Q. When did you first learn this information?

A. I don't recall exactly when. It seemed like it was early.

Q. Let me ask you, was it before your deliberations began? was it before the deliberations began or after?

A. I don't recall, Sir, if it was before or after. It seemed like it was early on.

Evidentiary Hearing Transcript at 29. Later during the following colloquy took place:

Q. Before or After any verdict were reached?

A. I believe is was before. I know that it was—there was a particular day, a couple of days that agent Berrellez was not in the courtroom, and I know it was before that....

Q. So it was before deliberations began while the trial was still going on?

A. Yes, Sir. Well, again, I don't know if it was before—I don't recall if it was before deliberations. It may have been early on in deliberations or it may have been before but again, it seems like we really didn't talk about that kind of thing until we went into deliberations where it think that—it makes me think it was after deliberations had started.

\* \* \* \* \* \*

Q. You said something about not seeing agent Berrellez in Court. That would indicate it was during the trial, wouldn't it?

A. Well, again, I am not sure, ...

\* \* \* \* \* \*

Q. You observed that he was not in court from the jury box?

A. Yes, Sir.

Q. So that indicates that it was during the course of trial; isn't that right?

A. Well, I believe he was sitting at the table during deliberations. Yes. I guess it would have had to have been. Yes, Yes....

Evidentiary Hearing Transcript at pp. 48–50. Juror Parris' explanation of the events

---

**3.** This testimony is considered only for purposes of determining the credibility of juror Parris. The Court believes it is informative as evidence of prior inconsistent statements. This testimony is not considered for purposes of determining the feelings or mental processes of the jury. Such a use would violate Federal Rule of Evidence 606(b).

simply is not believable because, in part, it was not possible. Parris claims he remembers when the jury discussed Dr. Alvarez Machain because it occurred a few days before agent Berrellez was not present in Court. However, Parris maintains that the discussion took place early during deliberations. This simply is not possible because the jurors could not have known whether agent Berrellez was present or not during deliberations. It appears to the Court that juror Parris was predisposed to inform the Court that all the alleged event took place "early on during deliberations."

This must be contrasted with the declaration elicited from juror Parris outside the controls of the Court at the hands of one or more of the defense attorneys and their investigators. This is precisely the type of problem Federal Rule of Evidence 606(b) contemplates and attempts to obviate. There are significant indications defense counsel may have over-stepped the bounds of permissible inquiry in this case. The declaration of juror Parris is replete with references to his and other jurors' mental processes, feelings and discussions while in the jury deliberation room.[4]

This juror may have been particularly vulnerable to the investigation by defendants. Juror Parris was originally chosen as the jury foreperson. Early during deliberations, however, he was replaced by juror Dolan.

### ■ Findings of Fact.

In light of the preceding discussion, the transcripts from the various questioning of the jurors, and the Court's evaluation of credibility, the Court finds defendants have established by a preponderance of the evidence:

■ several jurors brought newspapers into the jury room on a daily basis,

■ several jurors skimmed the headlines of articles to determine whether the articles were related to the case,

■ several jurors were exposed to a media report concerning commentary on the Matta verdicts, and

■ a few of the jurors knew a doctor related to the case was abducted from Mexico.

■ several jurors knew there had been a prior trial relating to this case;

The defendants have failed to prove by a preponderance of the evidence that the following allegations were improperly disclosed to the jury:

■ the jury knew about and discussed defendant Matta' prior conviction and sentence,

■ the jury discussed the prior trial and convictions,

■ the jury knew about and discussed corruption in the current Mexican government,

■ the jury was exposed to ex parte contacts with court personnel, and

■ juror Dolan had a pretrial bias which infected the jury.

### II. Outside Influences On The Jury

■ The appropriate analysis for a new trial motion on grounds of extrinsic evidence before the jury is as follows:

■ Was the jury exposed to information material to the trial which was not presented at trial subject to cross examination and other judicial controls?

■ If so, was the information prejudicial, ie. was the information directly and rationally related to an adverse verdict?

■ If so, has the government overcome prejudice by showing beyond a reasonable doubt the information did not contribute to the verdict?

If the government fails to demonstrate the information did not contribute to the verdict, a new trial must be granted. The government correctly points out that there are two different standards to be applied to the two types of juror exposure to outside influences. The Ninth Circuit has distinguished between extrinsic information which reaches the jury and ex parte com-

---

**4.** The Ninth Circuit has noted that it is improper and unethical for lawyers to interview jurors to discover what was the course of deliberation.

*See, Northern Pacific Railway Co. v. Mely,* 219 F.2d 199, 202 (9th Cir.1954) and *Smith v. Cupp,* 457 F.2d 1098 (9th Cir.1972).

munication with the jurors which does not pertain to any fact in controversy or any law applicable to the case.

### A. Extrinsic Information.

■ A defendant is entitled to a new trial when (1) the jury obtains or uses evidence that has not been introduced during trial and (2) there is "a reasonable possibility that the extrinsic material *could* have affected the verdict." *Marino v. Vasquez*, 812 F.2d 499, 504 (9th Cir.1987) (hereinafter *Marino*) (emphasis in original). The first step of the analysis requires the defendants to prove by a preponderance of credible evidence that the jury was exposed to extrinsic evidence. *See, U.S. v. Gaffney*, 676 F.Supp. 1544, 1550 (M.D.Fla.1987) (citing *U.S. v. Winkle*, 587 F.2d 705, 714 (5th Cir.)), *cert. denied*, 444 U.S. 827, 100 S.Ct. 51, 62 L.Ed.2d 34 (1979) and *U.S. v. Riley*, 544 F.2d 237, 242 (5th Cir.), *cert. denied*, 430 U.S. 932, 97 S.Ct. 1554, 51 L.Ed.2d 777 (1977). There is no presumption that the jury was exposed to extrinsic information. In fact, there is an opposite presumption that the jury performed its duties faithfully and diligently.

■ For the second step, "[t]he proper question is 'whether it can be concluded beyond a reasonable doubt that extrinsic evidence did not contribute to the verdict.'" *Marino, supra*, 812 F.2d at 504 (*citing Gibson v. Clanon*, 633 F.2d 851 at 855 (9th Cir.1980)). The court must determine what was seen or heard by the jury and then, in light of the record as a whole, determine whether the extrinsic information *could have* influenced the verdict. The question is not whether the extrinsic information actually affected the verdict, but whether it reasonably could have.

### ■ *Prejudicial Effect*

■ There is no bright line test to determine whether extrinsic information is prejudicial therefore requiring a new trial or non-prejudicial and therefore allowing the verdict to stand. However, the Ninth Circuit in *Bagnariol* observed one distinction between prejudicial and non-prejudicial information. When juror misconduct relates directly to a material aspect of the case and there exists a direct and rational connection between the extrinsic material and·a prejudicial jury conclusion, courts will usually require a new trial. *Bagnariol, supra* 665 F.2d at 885.

■ If extrinsic material is prejudicial, at least one juror being exposed to some of the prejudicial information is sufficient to require a new trial. *Dickson v. Sullivan*, 849 F.2d 403, 407 (9th Cir.1988) (*citing Vasquez*, 597 F.d at 194).

### ■ *Government's Burden to Rebut.*

■ Once the court determines the jury obtained extraneous material and there is a reasonable possibility the material could have affected the verdict, a defendant "is entitled to a new trial unless the government can prove that any constitutional error was harmless beyond a reasonable doubt." *Hughes v. Borg*, 898 F.2d 695, 700 (9th Cir.1990). The government bears the burden of proving that constitutional errors are harmless beyond a reasonable doubt. *Marino* at 504.

■ The government may establish harmless error by showing that the extraneous material was merely duplicative of evidence introduced in open court.[5] *Hughes*, 898 F.2d at 700. Or, the government can avoid a new trial by demonstrating harmless error by showing the other evidence amassed at trial was so overwhelming that the jury would have reached the same result even without the extraneous material. *Hughes*, 898 F.2d at 700 (*citing Bagnariol*, 665 F.2d at 887, and *U.S. v. Tebha*, 770 F.2d 1454, 1456 (9th

---

5. A number of federal courts have recognized that extraneous information which is duplicative or cumulative may render the jury misconduct error harmless. *See, United States v. Bagley*, 641 F.2d 1235, 1241 (9th Cir.1981) [mistrial properly denied where extraneous material was merely cumulative of evidence already admit- ted]; *U.S. v. Guida*, 792 F.2d 1087, 1094 (11th Cir.1987) [no reasonable possibility of prejudice where extraneous information was cumulative]; *U.S. v. Treadwell*, 760 F.2d 327, 339 (D.C.Cir. 1985) [transmittal of extraneous document to jury is harmless error where document is cumulative].

Cir.1985)). The Ninth Circuit in *Hughes,* adopted the following standard for finding the evidence overwhelming: "the other evidence adduced at trial [must be] 'so overwhelming that "we can say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." ' " *Id.* at 701, *citing U.S. v. Henry,* 528 F.2d 661, 668 (D.C.Cir.1976).

■ In addition, the Ninth Circuit has identified five factors relevant to determining whether the prosecution has successfully rebutted the presumption of prejudice arising from the introduction of extraneous evidence:

■ whether the material was actually received and if so how;

■ the length of time it was available to the jury;

■ the extent to which the jurors discussed and considered it;

■ whether the material was introduced before a verdict was reached and if so at what point in the deliberations; and

■ other matters which bear on the issue of reasonable possibility of whether the extrinsic material affected the verdict.

*Marino, supra,* 812 F.2d at 506 (citing *Bayramoglu v. Estelle,* 806 F.2d 880, 887 (9th Cir.1986)). No one factor is determinative in any given case. *Dickson, supra,* 849 F.2d at 406.

■ The Ninth Circuit also considers a time factor in considering prejudice. Apparently, when a jury deliberates for a long period of time, this indicates the jury considered the matter to be a close case and did not find the evidence overwhelming for one side or the other. *See, Gibson v. Clanon,* 633 F.2d 851, 855 (9th Cir.1980). Furthermore, the time when the jury was exposed to prejudicial information is important. For instance, if the jury was deliberating for a significant period of time, was then exposed to extrinsic evidence, and quickly rendered a verdict, it could indicate the information affected the verdict.

**B. Analysis of Law to Findings of Exposure to Extrinsic Information.**

*1. Local newspapers in the jury room.*

■ The mere fact that local newspapers were in the jury room does not amount to extraneous influences on the jury. It can not even be characterized as extrinsic evidence. *See e.g., U.S. v. Brewer* 783 F.2d 841 (9th Cir.1986) [magnifying glass in the jury room used by the jury to examine photographic evidence did not constitute extrinsic evidence]. In *Brewer,* there was no contention that the jurors understood the magnifying glass itself had any bearing of the case. Newspapers by themselves are similar to a magnifying glass, not reasonably understood to have any bearing on the case.

■ Simply reading local papers has no bearing upon any issue or law relevant to the trial. When juror misconduct relates directly to a material fact or law at issue in the case and there is a direct and rational connection between the extrinsic material and a prejudicial jury conclusion, the Ninth Circuit usually finds prejudice. *Bagnariol, supra* at 885. There is juror testimony that the view, sports and business sections of the L.A. Times was read by the jurors during the trial. However, most, if not all of the articles about the case were in the front page or Metro section of the paper. Furthermore, it is impossible to find a direct and rational connection between the newspapers and a prejudicial jury conclusion. The defendants need to show that the portions of the papers which were read contained articles relevant to the trial. *See, U.S. v. Brodie* 858 F.2d 492 (9th Cir. 1988) [there was no direct and rational nexus between the extraneous material, the "Citizens Rule Book," and the verdict because the book made no reference to any issue at the trial].

The jurors stated they took precautionary measures to insure against reading articles about the case. The newspaper recovered from the jury room substantiates this claim. That newspaper had the page removed corresponding to the page on which an article about the case was locat-

ed. All the jurors have uniformly testified that they, themselves, did not read newspaper articles about the case during the course of the trial or deliberations. Juror Parris does not say that he read articles, only that other jurors must have because of topics they allegedly raised during deliberations. He acknowledges that he did not see any juror reading any article about the case. Therefore, the Court concludes that no juror read an article about the case during the trial or deliberations.

### 2. Jurors skimmed headlines about the case on a daily basis.

██ The Court reviewed the headlines of the articles attached as exhibits to this motion prior to the original hearing on this motion. The headlines only briefly restate who testified on a given day or what was testified about. One headline read "Tape of Camarena's Torture Might Be Withheld From Jury." L.A. Times, Wed. June 6, 1990.[6] A second reads, "Judge Overrules Bid to Link CIA, Drug Lords in Camarena Trial." *L.A. Times* Friday June 8, 1990. Some of the headlines identify the problems with Dr. Machain. The only defendant referred to by name was Matta, and that was the article describing his verdict.

For the court to find that the headlines were prejudicial to any defendant, the court must find that the headlines or a single headline relate[s] directly to a material issue in the case and a direct and rational relationship exists between the headline[s] and an adverse verdict. *Bagnariol, supra* at 885. It can not be said that any headline in the articles attached as exhibits relate[s] directly to a material issue in the case. Furthermore, there is no direct and rational relationship between any headline and a guilty verdict. The headlines are uninformative and primarily repetitive of the prior day's evidence.

Mrs. Overholt stated that if she started to read something that said "Camarena", she would simply put the article away. Reporter's Transcript of *In Camera* Hearing at p. 20. Mr. Espinoza stated that the jurors would stay away from anything that

pertains to the trial. *Id.* at 37. Mr. Wood said that if he would see anything on the case he would just go on to the next page. *Id.* at 39. Ms. McDaniels testified that she would remove articles from the papers brought into the jury room and put them in her purse. *Id.* at 43. The skimming of headlines is an attempt to implement the Court's instruction not to read articles relating to the trial. This is evidence that the jurors took the Court's instructions seriously. In this case there was no prejudicial information in the headlines and skimming the headlines should not be considered a valid ground for a motion for a new trial. The Court concludes beyond a reasonable doubt that there was no prejudice from jurors skimming headlines.

### 3. Juror exposure to defense counsel's commentary.

██ Immediately after the jury rendered its verdicts as to defendant Matta, defense counsel for Matta made numerous comments to the press criticizing the verdicts as inconsistent and accusing the jury of being confused. Defendants have demonstrated members of the jury were exposed to these comments as well as media accounts of the verdicts. However, the Court believes the comments and media coverage are not directly related to a material issue in the cases of the remaining three defendants. The statements by attorney Stolar and the press relating to any inconsistency in the verdicts do not have a direct and rational relationship with an adverse verdict rendered against any of the three remaining defendants.

██ The exposure strengthened the jury's resolve to produce a verdict based on the evidence and the law. Juror Parris was asked whether the exposure had any affect in the way he made his decisions in this case to which he stated:

Mr. Parris: The only way I was affected is I went back and read the instructions again to see if I have—if I had been stupid.

And was I affected in my decision; no I don't think I was.

**6.** The tape was eventually admitted into evidence.

The Court: You made your decision based on your conscientious belief that they were the right decision?

Mr. Parris: Absolutely. Absolutely.

The Court: Do you think that's the case with the other jurors, as well?

Mr. Parris: I think so. If anything, the conversation made everyone just kind of slow down and go back. Like I said, we reread the instructions again and we discussed the instructions a little bit clearer.

Reporter's Transcript of *In Camera* Hearing at p. 35. The Court notes this passage from the transcript, not for the purpose of showing the jurors mental process, but *to demonstrate that the comments and media coverage did not address an issue in the case.* The jurors merely went back and read the instructions and did not consider the comments as influential on their verdicts.[7]

*4. Jury discussion of prior convictions of three other Defendants in earlier Camarena trial.*

Defendants contend the jury became aware, during the course of this trial, that a prior trial had occurred in which defendants were tried for the torture and murder of agent Camarena. Defendants cite numerous cases involving extrinsic information about a codefendant's prior conviction or guilty plea. In *U.S. v. Posner*, 644 F.Supp. 885 (S.D.Fla.1986), the jury became aware that a codefendant, whom the jury knew about from evidence and testimony at trial, had plead guilty to the same charges defendant was facing. In addition, one of the jurors also visited the property site in question in the case. The district court found these two improper influences to be sufficient to warrant a new trial. The district court made a factual finding that the jurors discussed the guilty plea during the trial and during deliberations. In fact, the court found the jurors discussed the guilty plea at the time when the jury was considering the prospect of a hung jury.

With respect to the knowledge of the codefendant's guilty plea, the court referred, without further discussion, to a Fifth Circuit case, *U.S. v. Winkle*, 587 F.2d 705 (5th Cir.1979). In *Winkle*, the jury discussed the codefendant's guilty plea. The sole count which the codefendant and the other defendants were tried was the conspiracy count, on which the codefendant was not convicted. By contrast, defendant Winkle was convicted on 19 substantive offenses by overwhelming evidence. The Fifth Circuit could not discern any prejudice from the jury's awareness, with respect to the conspiracy count, that Winkle may have associated with a criminally tainted individual. *Winkle*, 587 F.2d at 715. Defendants also cite to other cases involving codefendants' guilty pleas being exposed to the jury. In all the cases it appears the jury was quite familiar with the codefendants' names and the charges to which they plead guilty. *See, U.S. v. Harrell*, 436 F.2d 606, 617 (5th Cir.1970) [prosecution introduced evidence of codefendant's guilty plea at trial and court failed to give limiting instruction] and *U.S. v. Hansen*, 544 F.2d 778, 779–780 (5th Cir. 1977) [court instructed jury that a specific codefendant, whom the jury would hear about during the trial, plead guilty prior to trial].

In the present case, the jurors had no information about the relationships between the two trials nor who was prosecuted in the prior trial and for what crimes. Even the individual defendants in this case were not charged with the same offenses. Furthermore, there is no indication the jurors knew the outcome of the prior trial.

There is no reasonable inference to be drawn from mere knowledge of a prior trial. To be prejudicial, the information must be reasonably related to a material issue in the case. There is no reasonable relationship between mere knowledge of the prior trial and any issue in this case.

---

7. It should be noted, statements by jurors as to their own or other jurors' general knowledge, opinions, feelings, and bias that they carry into the jury room are not competent evidence. Mr. Parris' statement that this information affected how he and other jurors viewed Matta and the other defendants is not competent evidence and can not be considered. This goes directly to the thought process of the jurors and/or the internal activities of the jury.

Therefore, there can be no prejudice to defendants.

5. *Discussions about [a] the abduction of Dr. Machain; [b] agent Berrellez's role; [c] Mexico's desire to extradite Berrellez; and [d] the U.S.'s response that the extradition attempt was in retaliation to the case.*

■ Doctor Humberto Alvarez–Machain is a Mexican national charged in connection with the torture/murder of DEA Special Agent Camarena–Salazar. On April 2, 1990, Dr. Machain was abducted at gun point from his office in Guadalajara and transported to El Paso, Texas and turned over to the DEA. The abductors were paid for their services pursuant to a prior agreement with the DEA. The Mexican Government filed a formal protest of these events. All this took place prior to the trial of these four defendants. During the course of the trial, this Court granted Doctor Machain's motion to dismiss the indictment and ordered the doctor expatriated. *See, U.S. v. Caro–Quintero,* 745 F.Supp. 599 (C.D.Cal.1990).

Discussion of the Dr. Machain abduction by itself does not relate to a material issue in the present case. Nor does the abduction directly and rationally relate to an adverse verdict for any one of the defendants. There appears to be no prejudice from the alleged discussions of the abduction.

Defendant Bernabe–Ramirez contends these allegations serve to bolster the credibility of agent Berrellez and the prosecution's case. Defendant cites *Gibson v. Clanon,* 633 F.2d 851 (9th Cir.1980), *cert. denied,* 450 U.S. 1035, 101 S.Ct. 1749, 68 L.Ed.2d 231 (1980) for the proposition that bolstering the government's witnesses is prejudicial. In *Gibson,* a juror consulted an outside encyclopedia to confirm blood type AB is rare and discussed this with the jury. The court found the extrinsic evidence to be prejudicial, but despite that did not grant a new trial. The evidence that the blood type AB is rare logically strengthened the inference that one of the defendants had possessed the murder weapon and not some unknown assailant

with the same blood. Evidence of the rarity of the blood type had been ruled inadmissible. *Id.* at 855. *Gibson* is distinguishable from this case in that the blood type directly and materially bolstered the prosecution's witness and the prosecution's case. In this case, however, any attempt to construct a relationship between knowledge of the abduction of Dr. Machain and a prejudicial bolstering of a witness is tenuous at best.

In a situation similar to this case, the Third Circuit declined to reverse. In *Government of Virgin Islands v. Gereau,* 523 F.2d 140 (3d Cir.1975), *cert. denied,* 424 U.S. 917, 96 S.Ct. 1119, 47 L.Ed.2d 323 (1976). Information concerning killings that occurred during the trial and rumors of FBI investigations of persons involved in the case entered the jury room. The trial judge was unable to determine the actual source of the rumors or information nor the means by which the jury learned of them. The trial court characterized the incidents as "normal jury pressures and intra-jury influences." 523 F.2d at 151. The Third Circuit accepted those characterizations and denied a new trial. The Ninth Circuit approved of this holding in *U.S. v. Bagnariol,* 665 F.2d 877, 887 (9th Cir.1981). Similarly, the allegations of knowledge of Dr. Machain are not directly related to any material issue in the trial. The circumstances surrounding Dr. Machain, while perhaps distracting, if known, do not tend to bolster the government's case against these defendants. Nor does the information contradict any of the defendant's theories of defense nor impeach their witnesses or evidence. The slight amount of information apparently known to the jurors in no way can be said to be prejudicial.

6. *Peso/dollar exchange rate.*

■ The Court did not inquire into this subject at the evidentiary hearing because the Court felt there was sufficient information before the Court to determine whether the information was prejudicial, assuming the allegation of exposure to be true. After considering the Parris declaration in light of the *in camera* questioning and the testimony at the evidentiary hearing, there

is no reason to believe the jury even discussed this information. However, even if the Court assumes the jurors did discuss an exchange rate, it does not appear a new trial is warranted.

This information appears to have been part of the general knowledge of two of the jurors. Defendants do not allege that any external or extrinsic evidence brought this to the jurors' attention. Defendants admit that this information was based on personal experiences in Mexico. The sole question for the Court is whether this personal experience information was prejudicial to the defendants. How the information was considered and whether it actually influenced the jury's decisions is not subject to inquiry. Therefore, this Court can only consider the fact that two jurors had personal knowledge of the peso/dollar exchange rate and this exchange rate was discussed by the jury.

Defendant Zuno–Arce offers a few cases for the proposition that a juror's interjection into deliberations of personal knowledge unique to themselves and related to the litigation constitutes reversible error. *See, Bulger v. McClay*, 575 F.2d 407, 412 (2nd Cir.), *cert. denied, Ward v. Bulger*, 439 U.S. 915, 99 S.Ct. 290, 58 L.Ed.2d 263 (1978). First, it must be questioned the relevance of this case to this proposition. It appears defendant's address in this case was introduced to the jury by way of a magazine article, not by the personal knowledge of any one juror. In addition, in *Bulger*, court held jury's knowledge of and discussions about the defendant's home address was reversible error. The court had little trouble finding the information directly related to a material issue in the case because "[t]he discovery by the jurors that [defendant] lived a good many miles from the scene of the burglary certainly tended to discredit his excuse for being at the bus stop." *Bulger*, 575 F.2d at 411. This was coupled with the court's finding that the jury had trouble accepting one of the prosecution's witnesses making the determination of guilt a very close call. *Bulger*, 575 F.2d at 411.

The *Bulger* case is distinguishable from this case. In this case, the sale of the residence was only relevant to the fact that defendant Zuno–Arce was involved with the others in the enterprise. The government did not attempt to prove a sham transaction and defendant did not attempt to prove an arms-length transaction as a way of showing a lack of association with the enterprise.[8] Therefore, neither the theory of prosecution or defense would necessarily be bolstered or undercut by the jurors' knowledge of an exchange rate. If the exchange rate were relevant, it seems likely one party or the other would have attempted to introduce directly evidence of an exchange rate.

The government cites a case contrary to defendant Zuno–Arce's proposition. In *Hard v. Burlington Northern Railroad*, 870 F.2d 1454, 1461 (9th Cir.1989), a case under the Federal Employer's Liability Act for negligent injury, the plaintiff sought a new trial based on allegations that one of the jurors had attempted to persuade the jury, based upon his own experience in x-ray interpretation, that the x-rays admitted into evidence showed no injury. On remand after an evidentiary hearing, the district court denied the motion for a new trial and the Ninth Circuit affirmed stating:

> [E]ven if [the juror] did assert some special knowledge regarding x-ray interpretation we do not feel that a new trial would be warranted. It is expected that jurors will bring their life experiences to bear on the facts of a case. *Head v. Hargrave*, 105 U.S. 45, 49, 26 L.Ed. 1028 (1881). While it is clearly improper for jurors to decide a case based upon personal knowledge of facts specific to the litigation, a basic understanding of x-ray interpretation falls outside the realm of impermissible influence.

*Hard*, 870 F.2d at 1462. If knowledge of x-ray interpretation is not impermissible,

---

**8.** Although juror Parris' declaration states the jury considered the peso exchange rate and many of them found it relevant to whether the transaction was a sham, this is the type of evidence which FRE 606(b) prohibits. Therefore, the only competent evidence before the Court is the statement by juror Parris that the exchange rate was discussed.

then the peso/dollar exchange rate does not appear improper. In *Hard,* the interpretation of the x-ray was directly related to whether plaintiff should be compensated, the primary issue in the case. Here, the exchange rate is a peripheral issue and something which requires no expertise. The exchange rate is something an average person could reasonably have in their general knowledge. This is particularly true in Southern California, where excursions into Mexico are not uncommon.

Furthermore, the Court believes that any information the jurors may have brought with them into the jury room is cumulative of evidence offered at trial. On cross-examination by defense counsel, Cervantes was questioned about how much he was being paid as a police officer in Mexico. Defense counsel asked that he convert that into United States dollars. This testimony was sought to allegedly show that Cervantes made very little money and therefore had a financial motive to become a government informant. What this did, however, was to put before the jury testimony as to the exchange rate between dollars and pesos. Therefore, even if it were improper for the jurors to bring this type of information into the jury room as general knowledge, the exchange rate is not prejudicial because it was already in the record.

### C. Ex Parte Contact with Court Personnel.

The Ninth Circuit in *U.S. v. Madrid,* 842 F.2d 1090 (9th Cir.1988) concluded that recent Supreme Court decisions "firmly established that a defendant must demonstrate 'actual prejudice' resulting from an ex parte contact to receive a new trial." *Id.* at 1093. However, the court limited the applicability of this rule to ex parte contacts which did not pertain to "any fact in controversy or any law applicable to the case."

In *Dickson v. Sullivan,* 849 F.2d 403 (9th Cir.1988) the Ninth Circuit applied the standard for extraneous information (reasonable possibility the extrinsic material could have affected the verdict) when a deputy sheriff remarked to a few jurors that defendant "had done something like this before." *Id.* at 405. The court in *Dickson* was particularly concerned about the highly prejudicial nature of commenting upon the defendant's past criminal acts. The court concluded that there was a "direct and rationale relationship between the statement that [defendant] 'had done something like this before' and the conclusion that [defendant] had done 'this' again." *Id.* at 407. From these cases, the Court draws the conclusion that when the ex parte contact does not pertain to any fact in controversy or any law applicable to the case then the defendant must shoulder the burden of establishing actual prejudice. However, when the ex parte contact pertains directly and rationally to a material fact or applicable law, then prejudice is presumed and the burden is on the government to demonstrate the influence was harmless beyond a reasonable doubt.

The Court finds that defendants have failed to prove by a preponderance of the evidence that the jury was exposed to ex parte contacts with courthouse personnel. Even if the Court were to find the jury was exposed to such contacts, the contacts alleged do not relate to any fact in controversy or any applicable law. Therefore, it would be incumbent upon defendants to prove actual prejudice, which the Court finds they did not. It is the Court's opinion that even if defendants had proven the contacts, defendants have failed to demonstrate actual prejudice from the contacts. The following is a discussion of the alleged statements by courthouse personnel.

### 1. After Matta verdict one of the marshals said it was alright to read newspaper accounts of the trial.

This comment does not relate to any fact in controversy or any law applicable to the case. The mere fact of whether it is alright to read a newspaper was not in dispute in the case. Therefore, the defendants must establish that the statement actually prejudiced each defendant. *U.S. v. Madrid,* 842 F.2d 1090, 1093 (9th Cir.1988)

(ex parte communication between a juror and the court's law clerk did not entitle the defendants to a new trial where the clerk's sole purpose and effect was to calm down the juror after she had been sworn at by a second juror).

Defendants' attempt to link actual prejudice with this comment by the bailiffs by stating "the Marshall's statements rise far above the threshold of possible prejudice to mandate a new trial." Defendants' Original Motion at p. 24. This falls far short of a demonstration of actual prejudice. Defendants have failed to establish a direct or rational relationship with the statement and any issue of fact or law material to this case. Furthermore, defendants have failed to make any argument that the verdicts would have been different but for this statement. Defendants have wholly failed to make sufficient showings to convince this Court that a new trial is required based upon bailiffs' statements that it was permissible to read newspaper articles about the trial.

▮▮▮▮ Even if the bailiff actually made the statement, after that point in time the Court instructed the jury it was not permissible to read or listen to media reports about the trial. Any such statement would have been cured by the instruction to the contrary.

2. *Bailiff said to jurors that he shouldn't serve in a jury because he would only be able to vote one way.*

▮▮▮▮ This statement has many possible inferences that could be drawn from it. The evidentiary hearing revealed that juror Parris asked the bailiff if he would be automatically disqualified from being a juror because he was a U.S. Marshal. The bailiff simply responded that "he didn't see any reason why he couldn't serve, and then he made—again, it was kind of a just off-the-hand comment; 'I don't think they would want me to serve because I could only vote one way'...." Reporter's Transcript, Monday, November 5, 1990 at pp. 52–53. From juror Parris' own testimony it is clear the bailiff was not speaking about the facts or defendants in this case.

The statement does not relate directly to a matter at issue in the case. Any application this statement has to the trial is purely by implication. The defendants argue that the Court should draw the inference that the bailiff was clearly saying in his view the defendants were guilty. The government, on the other hand, argues that this statement only indicates that the bailiff has a predisposition or bias and serves to reinforce the notion that a person with such a bias should not serve on a jury.

*Dickson v. Sullivan,* 849 F.2d 403 (9th Cir.1988) is not illuminating on this issue. There, the court determined that there was a reasonable possibility that two jurors were influenced adversely toward defendant when deputy sheriff responsible for escorting the jurors said that defendant had "done something like this before." Although the jury apparently did not discuss the statement, the comment was both directly related to a material issue and highly prejudicial. *Id.* at 407. In *U.S. v. Madrid,* 842 F.2d 1090 (9th Cir.1988) the ex parte communication was between the Court's law clerk and a juror. The communication related solely to trying to settle the juror down after she was sworn at by a second juror. Nothing in the communications could be considered even remotely related to any fact in controversy or any law applicable to the case.

In *Parker v. Gladden,* a bailiff stated to a juror "oh, what a wicked fellow, he is guilty" and said to another juror "If there is anything wrong [in finding him guilty] the Supreme Court will correct it." 385 U.S. 363, 87 S.Ct. 468, 17 L.Ed.2d 420 (1966). The Court held that the unauthorized conduct of the bailiff "involves such a probability that prejudice will result that it is deemed inherently lacking in due process." *Id.* at 365, 87 S.Ct. at 471 *citing Estes v. Texas,* 381 U.S. 532, 542–43, 85 S.Ct. 1628, 1633, 14 L.Ed.2d 543 (1965). This holding is very similar to *Dickson.* The statement relates directly to an important issue in the case, ie. guilt of the defendant.

The statement alleged in this case is not related to a material issue and is not preju-

dicial to any one defendant, or all defendants collectively. It is the Court's opinion that the alleged statement by the bailiff simply was not prejudicial is not grounds for a new trial.

### 3. Security guard would daily ask jurors if the jury was going to return a verdict that day.

 Defendants contend a security guard who manned the magnetometer security device at the front door to the courthouse would daily ask the jurors if a verdict would be returned that day. This contact does not relate to any fact in controversy or any law applicable to the case. Therefore, it is incumbent upon the defendants to demonstrate actual prejudice. The defendants have failed to so demonstrate.

The conclusory allegation that all the contacts exceed the minimum required for a new trial is completely uninformative. There is no argument to show a logical or rational relationship between these daily comments and an adverse verdict against any of the defendants. There is no need for further inquiry into this allegation because it is clearly not sufficient grounds for a new trial. This is simply every day courthouse banter and is not prejudicial.

### 4. Following the Zuno verdict a marshal stated that it would be better if the jury hurried and rendered the final verdict as to Velasco so that better security could be provided to all the defendants.

 This alleged statement does not relate to any fact in controversy or any law applicable to the case. Therefore, it is incumbent upon the defendant Velasco to demonstrate actual prejudice. Defendant Velasco has failed to allege any connection between this statement and a guilty verdict, but simply claims that the prejudicial impact is self evident. The claim is that the jury might have been influenced to rush a verdict. A rushed verdict is not necessarily prejudicial to defendant. *See, U.S. v. Weiner,* 578 F.2d 757, 765 (9th Cir.1978) *cert. denied,* 439 U.S. 981, 99 S.Ct. 568, 58 L.Ed.2d 651 (1978) [bailiff statement that he "assumed ... judge would 'like' a verdict" harmless]; *U.S. v. Brumbaugh,* 471 F.2d 1128 (6th Cir.), *cert. denied,* 412 U.S. 918, 93 S.Ct. 2732, 37 L.Ed.2d 144 (1973) [bailiff comments urging speedy decision and inquiring into numerical division of jury deemed harmless]. The Court finds the statement, if made, was not prejudicial to defendant.

### 5. Ongoing relationship between bailiffs and jurors during deliberations.

 Defendants complain that an ongoing relationship formed between the jurors and the bailiffs which prejudiced defendants. Apparently the bailiffs regularly entered the deliberation room, shared the juror's coffee and food, and chatted with jurors during the breaks. Defendants maintain that such frequent and "continual interactions with the bailiffs could only have served to reinforce the jurors' protective feelings towards agent Berrellez and the prosecutorial mission of the DEA, as they themselves felt protected by the U.S. government." Defendants' Motion at p. 30.

As discussed above, any feelings the jurors may have had are not properly subject to inquiry by this Court. The subjective feelings of protection or whatever can not be considered in determining whether external information or ex parte contacts was prejudicial and therefore requires a new trial. The defendants fail to allege any discussions with or comments by the bailiffs except those discussed above. Without being able to determine whether the contacts related to a matter in controversy or any law applicable to the case this Court is not able to allocate the burden of proof. Furthermore, the defendants have not alleged any specific contact for which the government can attempt to rebut. In such a situation, it would be unfair to place the burden on the government to establish that no prejudice resulted. The burden must be on the defendants to at least raise specific factual allegations of misconduct or improper contact for the government to address.

## III. JUROR BIAS AGAINST ALL DEFENDANTS FROM THE OUTSET

Defendants claim that juror Dolan was biased against the defendants from the outset of the trial. In support of this they refer to the out of court declaration by juror Parris. ¶ 7 of Parris's declaration states:

> 7. During the jury selection, and before either of us had been selected as jurors, I overheard Peggy Dolan, who was later elected the jury foreperson, state to another prospective juror that she did not understand why they would want her in this jury because she thought all of the defendant were guilty.

As noted previously, Parris' declaration is not regarded as credible by the Court. In addition, Parris may have harbored animosity toward juror Dolan. Juror Parris was first chosen to be the jury foreperson. However, he was later replaced by the jury who chose juror Dolan to be the jury foreperson.

 The existence of juror bias may violate a defendant's Sixth Amendment right to a fair and impartial jury. *See, U.S. v. Eubanks,* 591 F.2d 513, 516–17 (9th Cir.1979). The court must determine whether a juror's bias resulted in the denial of a fair trial. *U.S. v. Hendrix,* 549 F.2d 1225 (9th Cir.1977). This issue is separate and distinct from that of juror misconduct, and must be analyzed separately. *Bayramoglu v. Estelle,* 806 F.2d 880 (9th Cir. 1986). In order to prevail, the defendants must demonstrate the existence of actual bias. *Dennis v. U.S.,* 339 U.S. 162, 70 S.Ct. 519, 94 L.Ed. 734 (1950).

 The Supreme Court has long held that the remedy for allegations of juror impartiality is a hearing in which the defendant has the opportunity to prove actual bias. *Smith v. Phillips,* 455 U.S. 209, 215, 102 S.Ct. 940, 945, 71 L.Ed.2d 78 (1982). In such a hearing the trial judge must determine the circumstance, impact and possible prejudice with all interested parties permitted to participate. *Remmer v. U.S.,* 347 U.S. 227, 230, 74 S.Ct. 450, 451, 98 L.Ed. 654 (1954).

In *U.S. v. Hendrix,* 549 F.2d 1225 (9th Cir.1977) the Ninth Circuit was confronted with a situation identical to that in this case. There a prospective juror was overheard revealing a bias against and a predisposition to convict criminal defendants. The possible bias was brought to the district court's attention before trial. The district judge denied a request for an investigation. The Ninth Circuit affirmed the district court's ruling of no prejudice finding that the juror's statement that "she was here to see that they put some of these people away" was ambiguous and not necessarily referring to the defendant in that case. The Ninth Circuit went on to discuss the timing of the statement. The statement was made before the juror asserted her ability to give the defendant a fair trial and swore to determine the case impartially. Finally, the statement by the juror was not a normal type of prejudice that requires reversal. (referring to extraneous information reaching the jury).

> [D]ue process does not require a new trial every time a juror has been placed in a potentially compromising situation. Were that the rule, few trials would be constitutionally acceptable. The safeguards of juror impartiality, such as voir dire and protective instructions from the trial judge, are not infallible; it is virtually impossible to shield jurors from every contact or influences that might theoretically affect their vote. Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen. Such determinations may properly be made at a hearing like that ordered in *Remmer....*

*Smith v. Phillips,* 102 S.Ct. at 946.

 In this case, the Court cannot find that Juror Dolan actually made this statement. Furthermore, the juror took the oath and specifically stated that she would comply with the law and decide the case solely on the facts of the case. This allegation is identical to the situation in *U.S. v. Hendrix,* 549 F.2d 1225 (9th Cir.1977); it was allegedly made prior to the time the

**1584**

juror stated under oath that she had the ability to give defendants a fair trial and decide the case impartially. It is the Court's opinion that defendants in this case had a jury capable and willing to decide the case solely on the evidence before it. Therefore, the motion based upon the juror's pretrial bias is denied.

### CONCLUSION

This case emphatically demonstrates the wisdom of Rule 606(b). Absent its restraints, every verdict would be subject to impeachment, as lawyers and their investigators would prey upon unwary and vulnerable jurors seeking to find some way to overturn an unfavorable verdict. Juror Parris was the victim of such a process and was improperly exploited toward that end. These defendants had a fair trial by a conscientious and painstakingly thorough jury. To overturn their verdicts upon the grounds and showing made here would undermine the integrity of out jury system. Therefore, this motion for a new trial must be denied.

IT IS SO ORDERED.